# CHARLES MAHAN

*vs.*

# MILDRED J. ADAM.

*False Imprisonment—Detention of Employee—Charge of Larceny—Evidence—Instructions.*

False imprisonment is the unlawful restraint by one person of the physical liberty of another, the word false, in this connection, appearing to be synonymous with unlawful.　　p. 365

To constitute false imprisonment, there must be some direct restraint of the person, but confinement in jail or in prison is not essential, any exercise of force, or threat of force, by which in fact one is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, being an imprisonment.　　p. 365

The essence of the tort of false imprisonment consists in one's deprivation of his liberty without lawful justification, and the good or evil intention of the person by whom this is done does not excuse or create the tort; nor is the question of probable cause material.　　p. 365

In an action for false imprisonment, evidence that defendant, having charged plaintiff, his employee, with stealing, caused a detective to take her to police headquarters, where she remained two or three hours, at the end of which time she was permitted to go home, being told to return the next day, when she was released, *held* to be sufficient for submission to the jury.　　pp. 357-366

Where a question asked a witness is such that the answer may or may not have a bearing on the issues, and an objection to the question is therefore overruled, it is for the party objecting to move to have the answer stricken out, if it turns out to be irrelevant.　　p. 366

The competency of an expert is a preliminary question resting in the discretion of the court, and unless founded on some error of law, or on serious mistake, or abuse of discretion, the ruling is not reversible.　　p. 368

*Decided January 8th, 1924.*

Appeal from the Baltimore City Court (DAWKINS, J.).

Action by Mildred J. Adam, minor, by William J. Adam, her father and next friend, against Charles Mahan. From a judgment for plaintiff in the sum of $1,750, defendant appeals. Affirmed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Edwin T. Dickerson,* with whom was *Lindsay C. Spencer* on the brief, for the appellant.

*Howard A. Sweeten* and *Henry M. Siegel,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered in the Baltimore City court by Mildred J. Adam, the appellee, against the appellant, Charles Mahan, in an action for false imprisonment.

In the trial of the case twelve exceptions were taken to the court's rulings. One upon the prayers, including its action in overruling the special exceptions to the granting of the plaintiff's third prayer. The other exceptions relate to its rulings on the evidence.

By the defendant's first prayer, which was refused, the court was asked to instruct the jury that there was no evidence legally sufficient to entitle the plaintiff to recover.

In passing upon this ruling it will be necessary to go to some length in stating the evidence produced at the trial.

The plaintiff testified that the defendant, who was engaged in the candy business, had two stores in the City of Baltimore, one at 413 North Howard Street and the other on Baltimore Street, next door to the Emerson Hotel.

The plaintiff, a young woman, twenty years of age at the time of the trial, was, with others, employed as saleswoman

at the Howard Street store, and had been so employed by the defendant for about three weeks when, on the 28th day of December, 1921, the defendant said to her that he had been told by his daughter that she, the plaintiff, had been "topping off" sixty-cent candy with dollar chocolates. She denied the accusation, and he replied that he was only telling her what his daughter had told him. On the next day, December 29th, the defendant said to her, "Listen, kid, I want you to go to the Emerson with me this evening." She told him she could not go. He then asked where she was going that evening and she replied, "Nowhere." Whereupon he asked her why she could not go with him to the Emerson. She said she had to go home. He then told her to get her supper at the store and tell her father and mother she would not be home until eleven o'clock. She asked him "What for," and he said, "My skinny girl has gone back on me and I need someone." Then plaintiff then asked him what his wife would say, and he replied "the old girl" would never find it out. After saying this he walked off, but he came back to her and said, "You do not understand me, I want you to go to the store next to the Emerson," and he again told her to call up her people and tell them she would not be home until 11 o'clock and to get her supper at the store. When she arrived at the Baltimore Street store she found in charge of it a young woman whom she had not seen before, who showed her "how to ring up on the cash register." It had separate keys for the soda and candy sales. The war tax was kept on a piece of paper, and she was shown the money box under the counter where she was to put the money.

After the young woman had left the store, the plaintiff made a few minor sales and in each case rang up the register as she had been directed. Thereafter, about 7 o'clock, a woman came in the store and asked for a two-pound box of assorted chocolates, the price of which was sixty cents a pound. The plaintiff proceeded to wait upon her, but while

doing so a man came in and asked for a hot chocolate, saying that he was in a hurry. With the woman's consent, the plaintiff waited upon the man and received from him ten cents for the hot chocolate. This she put upon the register and then waited upon the woman, who gave to her one dollar and twenty cents for the assorted chocolates. She then 'phoned to her people and took five cents of that money to pay the charge. This was necessary as it was a pay 'phone. The balance, one dollar and fifteen cents, she put in the cash register and rang it up, and the ten cents received for the hot chocolate she put in the box and rang it up. When this was done Mahan came in and asked her if she had been busy. She told him she had not been very busy. He then said, after looking at the register, "What is the one dollar and fifteen cents for?" She at once became nervous because of the way in which he acted and the manner in which he asked the question. She replied, "I sold a two-pound box of candy for one dollar and fifteen cents." He then told her to close the store at 10.30 o'clock and go home, and walked out, saying good night.

After that Mr. Davis, who at that time was unknown to her, but who, she afterwards learned, was a detective, came in the store and asked for two pounds of assorted chocolate for one dollar. She told him she could not sell two pounds for one dollar, that the price was sixty cents a pound, but she would fix him up one and three-quarter pounds for one dollar. While she was waiting on him, two boys came in, and she sold them two coca colas, the proceeds of which she rang up, and when she received the one dollar from Mr. Davis, she rang up that sale as he was going out the door and "made out a slip to that effect."

Thereafter the defendant again came into the store, followed by Mr. Davis and a woman to whom she had sold the chocolates, Mrs. Hasketh, who was also a detective. The defendant said to them, "Take that thief out of here, take her out of here, she stole fifty dollars from me, ten dollars a day,

and she is a thief, do your duty, take her out of here." Davis said to her, "Come on to headquarters."

The plaintiff asked what she had done and Mrs. Hasketh said, "You know you did not ring up the ten cents of the young man's who came in and got a hot chocolate. The defendant had in the meantime been to the cash register, taking off the tape and looking at the sales, and to the cash drawer, and her pocket book was lying on the counter, "though the defendant did not go near it." That he told her to come around to headquarters. Mrs. Hasketh took her by the arm and they together walked up Calvert Street to the court house.

While in the store, the plaintiff told Davis and Mahan that she used the missing five cents to pay the 'phone charges already mentioned, and she suggested they could call up the number and ascertain the truth of her statement, which they did not do. That Davis, while still in the store, said in the presence of Mahan, "This young lady has done nothing outside of taking the five cents she has told you about," but the defendant said, "Do your duty, take her out." Mrs. Hasketh then said, "What about the ten cents you also took?" The plaintiff replied that she had put it in the box; that she could see it on the sales sheets, and if she would count the money she would find it in the box.

The witness further testified that she had been paid off the Saturday before and gave her mother eight dollars and had four dollars herself, and at this time she had in her purse around three dollars and told the defendant to look in her pocket if he thought she took the money; that Mr. Davis said, "No, I know where the money has gone, I won't search you," and witness said, "Well, let him (meaning Mr. Mahan) look in it," and he would not search the witness; that the defendant asked her to tell him who had been taking his money if she had not, and she told him that she had seen his daughter take money out of the cash register several times, but did not know what for.

On their arrival at the court house she was taken to the office of McGovern, captain of detectives. The defendant

there repeated the charge made against her that she had stolen money from him and, as she said, both he and Davis tried to make her confess she had stolen it. She remained at the detective's office until 11.30 o'clock, when she was permitted to go home, although, as she says, the defendant insisted upon her being held and sent to the central station. When she left she was told by Davis to appear at three o'clock on the next afternoon, which she did and at that time she was released and told to go home. She was never indicted and tried upon the charge of stealing defendant's money.

On cross-examination she admitted that she had said to Mrs. Hasketh that "I have never done anything like this before, and please don't tell my father." She said, however, in explanation, that she was talking about the five cents. She also stated that it was about 9.30 when she was taken from the store.

George W. Davis, the detective, when produced as a witness for the plaintiff, testified that he had known the defendant for five or six years, that, on December 29th, 1921, the defendant was in the office and made the complaint that he had a saleslady, whom he suspected of stealing fifty dollars from him the previous week, that he had arranged for her to come to the store that night and had also arranged to have a woman detective meet the witness to see if they could trap the suspected woman. The witness met the defendant at 8 o'clock and with him was Mrs. Hasketh, who the witness knew to be a store detective.

The defendant gave to Mrs. Hasketh one dollar and twenty cents and the witness one dollar, with which to purchase candy from the plaintiff in his store. The witness took the serial numbers of the notes and punched the eyes of George Washington on each of them. Mrs. Hasketh just went into the store and purchased candy and, upon her return, the witness went to the store. He asked the price of candy and was told by the plaintiff that it was sixty cents a pound, he said he wanted one dollar's worth, the plaintiff said she would have to make up two pounds light or a pound and three-

quarters. She wrapped up the package and he handed her
the dollar, which was a marked dollar. He was then five or
six feet from the door and after handing the money to her he
immediately went out without waiting to see what she did
with the money. He was instructed by the defendant not to
wait to see what she did with it. After this Mr. Mahan
went to the store after Mrs. Hasketh made her purchase and
before the witness made his, and looked at the cash register
and said there was a dollar and fifteen cents rung up. He
also testified that when the three, the defendant, Mrs. Has-
keth and himself, went into the store, the defendant asked the
plaintiff if she remembered selling this lady, Mrs. Hasketh,
a two pound box of candy, and she told him she had; that
the defendant looked on the register and saw the money
($1.20) was not rung up and the plaintiff broke down and
started crying and said she had never done anything like that
before. The defendant told the witness to do his duty and
that he and Mrs. Hasketh started to take the plaintiff out.
The plaintiff started crying and the witness asked her to come
back to the rear room as he wanted to talk to her about it;
she said she never did it before, that the money was in her
pocket book, she opened her pocket book and had "three dol-
lars and some change." The witness looked over the money
but did not see the serial numbers he had placed with her,
"there were two one dollar notes and neither of them was the
money sent in to purchase the candy." The witness told the
defendant "that the plaintiff was only five cents short and
she has explained that thoroughly"; that she had used it to
call up her people to tell them she had to work that night, as
she was directed. The defendant then said that "the plaintiff
had no business to take the five cents and if she would take
a nickel she would take more," and told the witness to do his
duty. The plaintiff then started to plead with the defendant
but he walked away, and would not have anything to do with
her. The witness further testified that the plaintiff said she
did not want her father to know anything about it, she had
never done it before, and when the plaintiff explained about

the 'phone call, the defendant said "she had lied about that lady, Mrs. Hasketh, selling this two pounds of candy," and asked the plaintiff what right she had to use his nickel; that the plaintiff pleaded with the defendant not to have her arrested, and several times the defendant told the witness "to do his duty." He did not recall any conversation between the plaintiff and the defendant with reference to the fifty dollars. He further testified that he questioned the plaintiff for one-half or three-quarters of an hour at headquarters and tried to get her to tell him the exact truth of the matter, "but she had sworn up and down that she had never stolen five cents in her life and this was the first thing she had done and she had made a mistake when she said she did not sell any two-pound box"; that he tried to quiet her down but she still stuck to the nickel "which she had used for the 'phone call, that this was the only nickel short"; that he kept trying to get the plaintiff to confess but she got on her knees and raised her hand and said she had never stolen anything in her life before. Q. She did not say she stole that night, did she?" Ans. She said, 'No, I never stole anything at any time.' " He further testified that the defendant went to the cash register and this was the signal for the witness to go in the store. The witness had never seen the marked money since it had left his hands or had the defendant shown the witness the marked money, nor had he said anything about it, or what became of it. He also stated that the plaintiff did not have the money "on her" and he "could not find out where they could arrest her, but the defendant said that the tape on the cash register showed she was five cents short."

Upon cross-examination the witness testified that the defendant did not insist upon the witness taking the plaintiff to the police station and locking her up, and did not oppose the witness releasing the plaintiff, "that the only thing the defendant suggested was for the witness to take the plaintiff to headquarters for the purpose of further questioning her."

He further testified on re-direct examination that the defendant said to him that he was "kidding her about going to the Emerson for dinner"; that he wanted her to go down to the other store.

The witness, when asked "Would you have arrested this girl if Mr. Mahan had not insisted upon her being arrested?" said, "the only thing I can say is Mr. Mahan insisted upon me doing my duty." And I thought that by bringing the girl to headquarters that she would break down and admit it. Q. "But she did not break down?" Ans. "She did not." And on re-cross-examination he testified that the defendant insisted upon his doing his duty, and that his duty was to do what he did do.

The only witness produced by the defendant was Jane L. Hasketh, the detective. She testified that she met Davis and the defendant at detective headquarters on the evening of December 29th, and from there they went to the lobby of the Emerson Hotel. That Detective Davis gave her a dollar and two ten-cent pieces to go to the defendant's store and buy two pounds of candy. This she did, and gave to the plaintiff the bill and the two ten-cent pieces. The plaintiff did nothing with the money while the witness was in the store. Without repeating her testimony, she corroborated the testimony of the plaintiff in the purchase of this candy, although she did not hear the money rung up while she was walking out of the store. From the store she went back to the hotel. After she returned to the hotel Mahan went to the store and was gone for about five or six minutes, and after his return Davis left, and in about ten minutes brought back with him a box of candy. All three then went to the store and Mahan asked the plaintiff if she had sold a five-pound box of candy, and she said "No." He then asked if she had sold any two-pound boxes, and she said "No." He then said, "Didn't you sell this lady a two-pound box of candy?" And the witness held up the box, and the plaintiff said, "Oh, yes, I did, but I had forgotten about it." That

the plaintiff did not seem to be nervous or excited until "we started talking." Mahan took the two-pound box of candy from the witness and asked the plaintiff if she had not sold it. The plaintiff then became very nervous and threw up her hands, and the defendant told Davis to do his duty, when the plaintiff said "My God, what does all this mean; I never did anything like this before; don't let my father know about it." Davis then tried to talk to her, but she wanted to talk only to the defendant, and he would not talk with her, but told Davis "to do his duty." The defendant started to put out the lights, and she, Davis and the plaintiff started to walk out of the store. She said it was a very cold night; she walked close to the young lady, but did not take her arm, and went with her to the detective headquarters, and Davis began to talk to the plaintiff, and the witness went home. She stated she did not hear the defendant say, "Take that thief out of here, get her out of here," but did hear him say the plaintiff stole the money, but the defendant asked the plaintiff about the one dollar and fifteen cents rung up on the register, and she told him that she used five cents to call up her mother, and the defendant told the detective "to do his duty *and take the plaintiff to headquarters.*" Nor did she hear the defendant say that the plaintiff had stolen fifty dollars from him on Christmas Eve, and had been taking ten dollars a day. Q. "And was there anything said by Mr. Davis to Mr. Mahan that the young lady had not done anything?" Ans. "Mr. Davis said she had only taken five cents." Q. "In other words, he assured Mr. Mahan that the girl had only taken five cents?" Ans. "Yes, sir." Q. "While you were there did she say anything about calling her mother or father?" Ans. "She said she had taken five cents to call her mother." She further testified "that the plaintiff made a full explanation about one dollar and fifteen cents rung up on the register in the presence of the witness, Mr. Mahan and Detective Davis, and said that she used five

cents to call up her mother, and stuck to her story, except that when the witness first asked about the two-pound box of candy, she said she did not sell a two-pound box of candy, but when her attention was called to it she said she had. That Mr. Mahan told the detective *"to do his duty and take the plaintiff over to headquarters";* that Detective Davis said to the defendant that the girl had only taken five cents and used that to call up her mother; that Detective Davis did not want to arrest the plaintiff, but the defendant told him to do his duty—that she had no right to take a nickel. She said that "the plaintiff was hysterical and was crying and carrying on and begged the defendant not to have her arrested, and said to the defendant, "I have never done anything like this before."

False imprisonment is the unlawful restraint by one person of the physical liberty of another, and, as here used, the word "false" seems to be synonymous with unlawful.

To constitute a case of false imprisonment there must be some direct restraint of the person; but to constitute imprisonment in such case, confinement in jail or prison is not essential. Any exercise of force, or threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment; the essence of the tort consists in depriving the plaintiff of his liberty without lawful justification, and the good or evil intention of the defendant does not excuse or create the tort. 11 *R. C. L.* 791. Or, as said by this Court, any deprivation by one person of the liberty of another without his consent, whether by violence, threat or otherwise, constitutes an imprisonment, and if this is done unlawfully, it is false imprisonment without regard to whether it is done with or without probable cause. *Lewin* v. *Uzuber,* 65 Md. 341; *Bernheimer* v. *Becker,* 102 Md. 254; *Fleisher* v. *Ensminger,* 140 Md. 620.

If we apply the above principles of law to the facts of this case, it is, we think, clearly shown that the court was right

in its refusal to grant the defendant's prayer asking that the case be withdrawn from the consideration of the jury for the want of evidence legally sufficient to entitle the plaintiff to recover.

The defendant's second prayer was also properly refused even though it contained a proper statement of the law of the case, as it was fully covered by the other granted prayers of the defendant.

The plaintiff's first and second prayers were properly granted, as they are in full accord with the above stated principles of law.

The defendant's special exceptions to the plaintiff's third prayer were, we think, properly overruled, as the prayer was not, in our opinion, defective because of the objection urged against it, and the prayer was properly granted.

In the first exception to the evidence the plaintiff had said that she had a conversation on December 28th with Mahan, the defendant, in reference to the candy she was selling, and she was asked what that conversation was. The question was objected to and the objection overruled. Her answer was that Mahan had said to her that his daughter had told him she had been topping off sixty-cent candy with dollar chocolates, and when she denied the charge Mahan replied that he was only telling her what he had been told by his daughter. The claim is made that this evidence was not material or relevant to the issues.

At this stage of the case the character of the answer, sought to be elicited by the question propounded, could not well have been forseen by the trial judge. The answer thereto might or might not have had some bearing upon the issues, but whether it had or had not, the fact would not have been known until the answer was given, and if it was then seen that the answer was irrelevant it could have been stricken out upon the motion of the defendant, but such motion was not made by him. But in any event we fail to see that the

admission of this testimony, unimportant in its character, was prejudicial to the defendant, even though irrelevant to the issues, and this is true of the second exception.

The third exception is to what Davis said to the plaintiff when she returned to police headquarters on the 30th day of December, as directed by him. He said to her, "I can't say anything; you have your attorney with you." And that as Mr. Mahan was not there, there was nothing at all to do and she could go home. There was nothing in this statement of Davis, if inadmissible, that could in any way have injured the defendant.

Nor do we discover any error in the court's ruling in the fourth exception.

The fifth exception was to the court's ruling in permitting the following question to be asked the plaintiff: "With reference to this menu card, you say that he had been in the habit of getting the girls to get menu cards?" To which she replied that she had been so told.

The sixth exception is to the question: "When he (the defendant) first asked you to go to the Emerson what did you think he meant by his invitation?" She answered the question by saying that she thought he wanted her to get one of the menu cards.

As to the fifth exception, she, as the question states, had already testified to the fact contained in her answer without objection being made thereto. The ruling in the sixth exception, if wrong, is not, we think, a reversible error. If his purpose was what she said she thought it was, it in all probability was much less censurable in its character than what the jury would have inferred from the invitation itself in the absence of such explanation, and consequently the defendant was not injured thereby.

The seventh, eighth and ninth exceptions are to the admissibility of the evidence of the plaintiff's physician given in relation to the cause which produced the nervous condi-

tion from which she suffered after her arrest and detention at the detective's office. The chief objection thereto, as we understand the defendant's counsel, went to the competency of the witness to testify as an expert in relation to such fact. In *Baltimore, Chesapeake and Atlantic Railroad Company* v. *Moon,* 118 Md. 392, this Court said: "The competency of the expert is a preliminary question resting in the discretion of the court, and unless founded on some error of law, or on serious mistake, or abuse of discretion, this ruling is not reversible." *Jones on Evidence,* section 369. The lower court, in our opinion, committed no error in its ruling thereon, but if so, it was not a reversible error.

Therefore, as we find no reversible errors in the rulings of the court below, we will affirm the judgment appealed from.

*Judgment affirmed with costs.*