## Patricia Hall PETTIJOHN For Herself & Two Minor Children *v.* Wayne SMITH, Troy HOWELL and NATIONAL SURETY CORPORATION

73-163                                   502 S.W. 2d 618

Opinion delivered December 24, 1973

*Lee Ward,* for appellant.

*G. W. Knauts,* for appellees.

CARLETON HARRIS, Chief Justice. Patricia Hall Pettijohn, appellant herein, and her former husband, Howard J. Hall, are the parents of two minor children, Wanda Lucille Hall, age 12 years, and James Howard Hall, age 10 years. The Halls were divorced in Clay County, Missouri, in November, 1970, appellant having been awarded the divorce. Two different versions of the custody order

contained in the decree are in existence, a purported photostat held by appellant reflecting that she was awarded custody, and Hall having had possession of a purported decree, attested by the Clay County, Missouri Clerk as being signed by the judge, reflecting custody of the children in Mr. Hall. The evidence (at the trial, hereafter discussed) reflects that the children had, from time to time, stayed with both parents, and it is undisputed that at the time of the events hereinafter set out, the children, by common consent of the parents, were living with appellant in her home in Piggott, Arkansas. Wanda had been with her mother since sometime in 1971, and the little boy was brought to appellant by Mr. Hall in November, 1972, Hall remaining in Piggott at that time. Charges were brought by Mrs. Hall against her ex-husband wherein he was charged with grand larceny, it being asserted that he had taken a collection of Avon bottles, said to be of a value of more than $100.00. Hall was arrested and jailed. On December 19, 1972, appellant filed a suit in the Chancery Court at Piggott asking for official custody of the two minor children, and service of summons was personally served on Hall in Clay County, Arkansas by Deputy Sheriff Troy Howell on that same date. The next day, Hall was released from jail on bond and, while appellant was at work at her employment just over the Missouri line, went with Deputy Sheriff Howell in the latter's car to the home of the grandmother and picked up Jimmy; thereafter, Hall and the deputy sheriff met an automobile in which Wanda was riding, Howell stopping such automobile and Wanda being transferred to the deputy sheriff's car. The children were taken to the police department where they transferred to Hall's automobile. Hall then, with the children, drove to the Pettijohn residence, followed by Officer Ralph Cavaness of the Piggott Police Department. Cavaness and Hall waited in the Cavaness car outside the home while the children went into the house to obtain their clothes. An older sister, Reta, came out of the house to talk to her father and Cavaness stated that he told her that she had better go back into the house. The children returned with their clothes, got in the car with their father and he drove them out of the state.[1]

---

[1]Wanda, about ten days later, was permitted to return to her mother's home.

Thereafter, appellant instituted suit against Sheriff Wayne Smith, Deputy Sheriff Howell, and Officer Cavaness, asserting that those persons, acting jointly with Hall, used the authority of their offices to coerce and compel the two minors to leave the home of their mother, against their will, with the intent and purpose of aiding and abetting Hall in removing them from the State of Arkansas "without any process of any nature from any court". Mrs. Pettijohn sought damages in her own behalf and on behalf of the two minor children, and further sought punitive damages. On trial, the jury returned a verdict for appellees[2] after a request for directed verdict for appellant against the defendants at the close of all the evidence had been denied. From the judgment entered in accordance therewith, appellant brings this appeal. Eight points are asserted for reversal, but inasmuch as we agree with appellant that the motion for a directed verdict should have been granted, there is no necessity to discuss in detail the other points. First, let us determine the authority of an officer in general. Under the provisions of Ark. Stat. Ann. § 43-403 (Repl. 1964), an officer may make an arrest in obedience to a warrant of arrest delivered to him, and may arrest without a warrant where a public offense is committed in his presence, or where he has reasonable grounds for believing that the person arrested has committed a felony. See also *Johnson* v. *State,* 100 Ark. 139, 139 S.W. 1117, and *Howard* v. *State,* 137 Ark. 111, 208 S. W. 293. Ark. Stat. Ann. § 42-201 (Repl. 1964) authorizes the prevention of public offenses by proceedings for suppressing riots and resistance to lawful authority, for requiring security to keep the peace, or for good behavior, and for arresting and confining insane, drunken, and disorderly persons.[2a] Ark. Stat. Ann. § 41-1601 (Repl. 1964) defines false imprisonment as "the unlawful violation of the personal liberty of another, and consists in confinement or detention without sufficient legal authority." In *Watkins* v. *Oaklawn Jockey Club,* 86 F. Supp. 1006, decided by the United States District Court for the Western District of Arkansas, Hot Springs Division, Judge John E. Miller said:

[2] The complaint against Cavaness was dismissed at the close of evidence.

[2a] See also Ark. Stat. Ann. §§ 43-429—43-436 (Supp. 1971), sometimes called the "Stop and Frisk" Statute. This was passed by the General Assembly and became Act 378 of 1969.

"Every confinement of the person is an imprisonment, and any express or implied threat or force whereby one is deprived of his liberty or compelled to go where he does not wish to go is an imprisonment."

This was the holding of our court in the early case of *Floyd* v. *State,* 12 Ark. 43. In *St. Louis I.M. & S. Railway* v. *Waters,* 105 Ark. 619, 152 S.W. 137, we pointed out that in an action to recover damages for false imprisonment, where the arrest is without a warrant, if the imprisonment is proved or admitted, the burden of justification is on the defendant.

Other jurisdictions hold similarly. In the Maryland case of *Mahan* v. *Adam,* 124 A. 901, the Court of Appeals said:

"Any exercise of force, or threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment; the essence of the tort consists in depriving the plaintiff of his liberty without lawful justification, and the good or evil intention of the defendant does not excuse or create the tort."

In *Griffin* v. *Clark,* 42 P. 2d 297, the Supreme Court of Idaho stated:

"In false imprisonment or unlawful restraint, the primary right involved is the liberty of the citizen; the right of freedom of locomotion; the right to come and go or stay, when or where one may choose. In the main the authorities disclose that in order to constitute an unlawful restraint or false imprisonment the essential thing is the restraint of the person. *** The true test seems to be not the extent of the restraint, nor the means by which it is accomplished, but the lawfulness thereof. There need be no actual force or threats, nor injury done to the individual's person, character, or reputation. Neither is it necessary that the wrongful act be committed with malice or ill will, or even with the slightest wrongful intention. Nor is

it necessary that the act be under color of any legal or judicial proceeding. All that is necessary is that the individual be restrained of his liberty; compelled to remain or go where he does not wish to; prevented from moving from one place to another as he may deem proper and desire, without sufficient authority, either directly or indirectly in any manner or by any means, by words alone, by acts alone, or by both, by merely operating on the will of the individual, through reasonable fear of personal difficulty, by actual or apparent force, etc., and the detention must be against the will of the person detained."

See also the Utah case of *Hepworth* v. *Covey Bros. Amusement Co.*, 91 P. 2d 507, and the Missouri case of *Titus* v. *Montgomery Ward & Co.*, 123 S.W. 2d 574.

Let us turn now to the facts in the instant case. Wanda, the twelve-year-old daughter, testified that on December 20, she was riding in a car with her aunt on the way to see her grandmother near Carryville. They were proceeding in that direction when a police car came up behind them with the lights flashing. She said that appellee, Troy Howell, was the driver of the car and that her little brother Jimmy, and her father were in the police car with him. Wanda stated that her father walked over and told her to get out of the car, which she refused to do, and Deputy Sheriff Howell said, "You are getting out of the car, young lady." She knew that he was a police officer and she got out and entered his automobile. Howell then drove off with the others in his car and went to the establishment where her older sister, Reta, worked; Wanda was told by her father to go get the house key from her sister. After obtaining the key, they were then driven to the police station where she, her brother, and father, transferred to the father's automobile and proceeded to the home of the mother where she and Jimmy were to get their personal clothing and articles. The witness said that Officer Ralph Cavaness followed them out to the home, and stood by his automobile while the children went into the house and obtained their belongings. She stated that her father then made her and the little brother get into his car and they were driven to Missouri.

Wanda testified that she first told her father that she would not go, and that she was unwilling to go with him, being afraid of him. She said that she did not get out of the automobile in which she was riding until Deputy Sheriff Howell ordered her to do so; that she obeyed because he was an officer; further, that she would not have gone with her father except for the presence of the officer. Wanda stated that she stayed in three different houses in Kansas and that finally, after her constantly repeating that she wanted to return, he permitted her to come back home. The little girl also testified that, in her presence, Jimmy stated that he wanted to stay in Piggott with "Mom". The witness said that Deputy Sheriff Howell did not take hold of her but did say, "You are going"; that he didn't offer to strike or harm her and that she did not recall him saying anything after telling her to get into her father's car.

Joyce Nash, a sister of appellant, testified that she was with Wanda when they were stopped on December 20. She said that Mr. Hall and Howell walked over to their automobile and the father told Wanda to get out of the car. When she refused, the witness quoted Howell as saying, "You are going, young lady; get out of that car." She stated Howell was wearing a "police uniform", and that she knew that he was an officer; that when she asked Howell if he was not going to let the mother know about it, "he says he didn't have to let her know anything."

Cathey Nash, another sister, was at her mother's home when Jimmy was picked up. She said Hall told Jimmy to get his things and that Troy Howell stated that Mr. Hall had a right to take Jimmy; that the latter cried and said he didn't want to go. She testified that Howell did not take hold of Jimmy and that she read a "paper" Mr. Hall had with him, but that it didn't mean anything to her. She added Jimmy was given his Christmas presents to take with him.

The Circuit and Chancery Clerk for Clay County, Arkansas testified that no order, or process, commanding an officer to do anything about the custody of Wanda or Jimmy had been issued by his office.

Ralph Cavaness, the city policeman, testified that acting under orders given to the radio operator by Sheriff

Smith and Howell, he followed the Howard Hall car to the Pettijohn home; he was aware that Hall and appellant were having a "custody fight." He said he waited in the car while the children obtained their wearing apparel and other items and said nothing except that he told Reta, when she came out of the house, that she had better go back to the house. He admitted that what he said to her was equivalent to an order. Cavaness stated that the radio operator had told him that he had a warrant, "the papers to pick the kids up."

Deputy Sheriff Howell, a deputy for four and one-half years, testified that he took Hall to pick up the children. He said that his purpose was "to keep down the peace", and that he had so acted in numerous "similar cases"; he admitted that on the occasion here in question he had been told by the sheriff to do so. Howell testified that he knew that under normal conditions he would need a process of some kind but stated, "not when the sheriff informs you to go, or tells you, sometimes you don't—you take his word." He said that he was given no process of any kind. Howell testified that the little boy cried when the father told him he was to leave with the father, and it appeared to him that Jimmy did not want to go. Howell denied that he made any statements, or did anything to force the children to leave. However, he did admit a fact which is very pertinent to this litigation, viz., that he stopped the automobile in which Wanda was riding. From the record:

"We met a car, a Chevrolet, '63 Chevrolet, and the little boy said, 'My sis is in this car, that car', and we turned around and I got them stopped just the other side of the Four-Mile-Turn, on the gravel road out there. I pulled up behind them and turned my light on.

Q. Uh-huh. Officer Howell, at that time was there any trouble out there?

A. There was no trouble.

Q. Did you or Mr. Howard J. Hall make the first—make any statements to the occupants of that other car?

A. I did not make no statements.

Q. Tell the jury, the best you remember it, what happened there.

A. Mr. Hall got out and got the girl out of the car; I got out of my car and went back and opened my left back door and let the girl sit down in my car."

Sheriff Smith did not testify.

There is no contention on the part of appellees that the officers were serving a court order, or doing anything at the direction of any court. While Howell denied making any statements, or taking any active part in picking up the children as testified to by the witnesses, the admitted act of stopping the car was completely without authority and, in itself, establishes liability. No unlawful act was being committed, or thought by the officer to have been committed when the car was halted, and the flashing light would certainly indicate authoritative police participation to those being stopped. One needs no great imagination to visualize the effect upon the children, either at the car or at the house, of a uniformed officer apparently acting in concert with their father.

From a legal standpoint, it makes little or no difference what the officer thought, or that he was acting under the orders of his superior (though this might be considered in mitigation of damages). The act of stopping the automobile, and of taking Hall in the police car to pick up the children, thus supporting the acts by Hall and lending an aura of official sanction by his presence, under the circumstances herein constituted false imprisonment of the children.

The failure of the sheriff to testify is interesting, and has some significance, in that no reason is ever given for the action taken. In *Starnes* v. *Andre,* 243 Ark. 712, 421 S.W. 2d 616, this court said:

"Failure of a party to an action to testify as to facts peculiarly within his knowledge is a circumstance which may be looked upon with suspicion by the trier of the facts. *Fordyce* v. *McCants,* 55 Ark. 384,

18 S.W. 371; *Broomfield* v. *Broomfield,* 242 Ark. 355, 413 S.W. 2d 657. His failure to testify gives rise to the presumption that his statements would have been against his interest. *Cady* v. *Guess,* 197 Ark. 611, 124 S.W. 2d 213."

Certainly, the burden was on the sheriff to explain his actions, and no legal reason, or for that matter, reason at all, having been given, the court should have granted the directed verdict for appellants.

As stated earlier, this holding precludes any necessity to discuss other points in detail. However, we have held that on remand for trial of a law case, it is tried *de novo.* See *Clark* v. *Ark. Democrat Co.,* Supplemental Opinion, 242 Ark. 497, 413 S.W. 2d 629. Aside from the directed verdict, four instructions were offered by appellant and refused by the court, but there is no reason to discuss these offered instructions since we have no way of knowing what the evidence will be on a second trial. Point VI is a contention that the court erred in refusing to let Mrs. Pettijohn tell the jury the reason given by the father in bringing Jimmy to her to make his home in Piggott. There was no tender of what this evidence would have been, and not knowing what she would have said, we cannot pass upon the point, though it is difficult to determine how the officers could have been liable for some statement made by Hall to his ex-wife.

It was also alleged that the trial court erred in refusing to let Mrs. Pettijohn testify that Mr. Hall was bound over by the Piggott Municipal Court for trial on the grand larceny charge. The court did not err as this would have been entirely hearsay testimony on the part of appellant. We are not here called upon to determine whether the clerk's records could have been properly offered to that effect.

Finally, it is asserted that the court erred in refusing to allow Mrs. Pettijohn to tell the jury that she had been awarded full and exclusive custody of the minor children by the Clay County, Arkansas, Chancery Court pursuant to the suit which she had filed, and which we have earlier

mentioned.[3] Again, Mrs. Pettijohn testifying to this fact would not have been the best evidence, but we are of the view that any evidence relating to this custody court order would have been inadmissible because of the fact that the order was not entered until after the events had occurred which are here complained of.

In accord with the views herein expressed, the judgment is reversed, and the cause is remanded to the Clay County Circuit Court with instructions to proceed in a manner not inconsistent with this opinion.

It is so ordered.

---

[3]Hall was in the courthouse on the day of the custody hearing, appearing in the Municipal Court during the morning on the grand larceny charge. The custody hearing was held in the early afternoon, but Hall elected not to stay for this hearing.