660 A.2d 447

**Richard ASHTON et al.**

v.

**Vanessa BROWN et al.**

**Vanessa BROWN et al.**

v.

**Richard ASHTON et al.**

No. 102, Sept. Term, 1992.

Court of Appeals of Maryland.

June 30, 1995.

N. Lynn Tillery, Frederick, Joseph F. Cunningham (Joseph F. Cunningham & Associates, all on brief), Washington, DC, for petitioner.

Willie J. Mahone (Daniel Q. Mahone, both on brief) Frederick, for respondent.

Kevin A. Dunne (David R. Johanson, Venel D. Brown, Ober, Kaler, Grimes & Shriver, all on brief), Baltimore, for American Civil Liberties Union of Maryland, amicus curiae.

Benjamin L. Brown, Washington, DC, and Neal M. Janey, Burton H. Levin, Baltimore, for National Instit. of Mun. Law Officers, amicus curiae.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI, BELL and CHARLES E. ORTH, Jr.,** Judge of the Court of Appeals (Retired, Specially Assigned), JJ.

ELDRIDGE, Judge.

The principal issue in this case concerns the constitutionality of the City of Frederick's juvenile curfew ordinance. As we shall hold that the ordinance is unconstitutional, we shall also consider claims for damages against the City of Frederick and members of its police department, arising out of the enforcement of the ordinance against the plaintiffs.

### I.

The plaintiffs in this case sought a declaratory judgment, injunctive relief, and money damages. The case was disposed of in the trial court by an order entered on the docket simply granting the defendants' motion for summary judgment and awarding judgment for the defendants for costs.

In reviewing the grant of summary judgment, this Court must consider the facts reflected in the pleadings, depositions, answers to interrogatories and affidavits in the light most favorable to the non-moving parties, the plaintiffs. Even if it appears that the relevant facts are undisputed, "if those facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper." *Clea v. City of Baltimore,* 312 Md.

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

** Orth, J., retired, and specially assigned, participated in the hearing, conference and decision, but died prior to the adoption of this opinion.

662, 677, 541 A.2d 1303, 1310 (1988). *See also, e.g., Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 145, 642 A.2d 219, 224 (1994); *Gross v. Sussex,* 332 Md. 247, 256, 630 A.2d 1156, 1160 (1993). Consequently, in this opinion we have set forth the facts in the light most favorable to the plaintiffs. Moreover, an appellate court ordinarily may uphold the grant of a summary judgment only on the grounds relied on by the trial court. *See, e.g., Gross v. Sussex, supra,* 332 Md. at 254 n. 3, 630 A.2d at 1159 n. 3; *Beckenheimer's v. Alameda,* 327 Md. 536, 545 n. 5, 611 A.2d 105, 109 n. 5 (1992); *Federated Stores v. Le,* 324 Md. 71, 79, 595 A.2d 1067, 1071 (1991), and cases there cited.

The Frederick curfew ordinance provides that it is unlawful · for a "child," defined as a person under the age of eighteen, to "remain in or upon any public place or any establishment" during the nighttime hours. Frederick City Code §§ 15–9(a), 15–10 (1966, Supp.1992).[1] An "establishment" is defined as "any privately owned place of business carried on for a profit or any place of amusement or entertainment to which the public is invited." § 15–9(c). The curfew ordinance expressly makes it "a misdemeanor" for parents to "knowingly permit" their children to violate the curfew, and for the "operator of an establishment[,] ... his agents or employees" to "knowingly permit" a child to remain on the premises during curfew hours. §§ 15–12, 15–13, 15–14(b–c). The misdemeanor defined in these sections is punishable by a maximum fine of $100.00 for each violation. § 15–14. The ordinance does not, however, provide that a minor is guilty of a misdemeanor for violating the curfew. Instead, the ordinance states that "[a]ny city police officer who finds a child violating any provision of section 15–10 shall take such child into custody as a child in

---

1. Section 15–10 reads as follows:

 "No child shall remain in or upon any public place or any establishment between the hours of 11:59 p.m. Friday and 6:00 a.m. Saturday; or between the hours of 11:59 p.m. Saturday and 6:00 a.m. Sunday; or between the hours of 11:00 p.m. and 6:00 a.m. of the following day on any other day of the week."

need of supervision. . . ." § 15–14(a).[2] A minor guilty of two curfew infractions within a twelve month period must be referred to the State Department of Juvenile Services. *Ibid.*

The curfew ordinance also contains broad exceptions. Section 15–11 states that "[t]he provisions of section 15–10 shall not apply to any child accompanied by a parent, or to a child upon an errand directed by such minor's parent, or to a child attending a cultural, scholastic, athletic, or recreational activity supervised by a bona fide organization, or to any child who is engaged in lawful employment during the curfew hours." The word "parent" is defined in § 15–9(e) to include, *inter alia,* "any person" 21 years old or older who has "temporary care or custody or responsibility for the supervision of a child." The ordinance does not define the term "bona fide organization."

Plaintiffs Tyeicka Bowens and Vanessa Brown were detained for suspected violations of the juvenile curfew ordinance during a curfew enforcement action at the Rainbow Hunan Restaurant ("the Rainbow") on Market Street in downtown Frederick. The Rainbow had lost its liquor license. In an effort to supplement their reduced income from the restaurant, the Rainbow's owners, Mr. and Mrs. Chi, had arranged with George Busey and his wife, specialists in promoting entertainment for young people, for a series of evening events at the Rainbow featuring live bands and dancing. Most of the young people who went to the dances at the Rainbow were African–Americans. Rap bands were a prominent part of the Buseys' concert series, and the music was loud.

Live entertainment at the Rainbow was controversial. During the summer and fall of 1990, Frederick residents complained to Mayor Paul Gordon about noise in downtown Frederick, particularly around the Rainbow. On October 19, 1990, Mayor Gordon took part in a candidates' forum, attended by fifty or sixty of Frederick's citizens. During the forum, the

---

**2.** Section 15–14 also directs the police to notify the child's parents of the fact that the child is in custody.

Mayor announced that he would respond to the citizens' complaints by initiating immediate, vigorous enforcement of the juvenile curfew ordinance.

The Mayor and the Police Chief, Major Richard Ashton, arranged a curfew crackdown at the Rainbow for the late evening of October 20 and early morning of October 21, 1990, during one of the Buseys' scheduled dances. While Chief of Police Ashton and other officers entered the Rainbow to check that the patrons were over eighteen, Officer Steven Scalf was instructed to stand outside and look for possible curfew violators. Officer Scalf detained Vanessa Brown, who was nineteen years old, as she walked along the street in the direction of the Rainbow. Brown was photographed, handcuffed and searched. The search included a "pat down" of Brown's "entire body, including the inside of [her] legs." The police had stationed a bus in front of the Rainbow so that suspected curfew violators could conveniently be detained there. Brown was held on the bus for approximately forty minutes.

Tyeicka Bowens, sixteen years old, was arrested inside the Rainbow.[3] Like Brown, Bowens was photographed, handcuffed and held on the bus. Bowens's detention lasted approximately three hours. She asserted that she was "frightened, intimidated and embarrassed" and that she was "afraid of being incarcerated."

According to affidavits filed by the plaintiffs, twenty-eight suspected curfew violators were detained in the crackdown at the Rainbow, all of whom were African–American.[4] Some of the plaintiffs' claims for relief were based upon their allegation that the enforcement action was racially motivated.[5] As

---

**3.** The plaintiffs do not identify in their complaint or other documents the officer who arrested Bowens.

**4.** According to the defendants, twenty-five of the twenty-eight arrestees were African–American.

**5.** The documents filed by the plaintiffs contain statistical evidence intended to support the plaintiffs' racial discrimination claims. According to 1990 census data, the population of Frederick City in that

Vanessa Brown put it, "Plaintiff does not believe that white teenagers have ever been rounded up in such a manner, even though it is community knowledge that white teenagers congregate beyond the curfew hours at the retail establishments."[6]

Indeed, the Rainbow may have been the only real target of the curfew crackdown. Although Chief Ashton described the police action on the night of October 20–21 as a "curfew enforcement on Market Street encompassing four restaurants," and Mayor Gordon stated that he intended to "include all restaurants . . . and not just the Rainbow," the police concentrated their efforts on the Rainbow. The police action there was thorough and systematic. A number of uniformed officers entered the restaurant, explained to the owners that they were there to enforce the curfew ordinance, and checked the ages of a large number of the patrons. Other officers were stationed outside to arrest any minors trying to leave the Rainbow. The police positioned a bus at the Rainbow to collect and detain the young people. There is no indication that any minor was taken to the bus from any place except the Rainbow. Officer Scalf described moving on to visit other Market Street establishments once the Rainbow enforcement action was complete, but, although he observed that they were

---

year was 40,148. 33,989, or approximately 84.2%, of those people were Caucasian. 5,151, or approximately 12.8%, were African–American. Nonetheless, 44 of the 62 minors arrested on curfew charges in 1990, or 71%, were African–American. Although the statistical disparity is partly explained by the 1990 enforcement action at the Rainbow, the remaining arrests during 1990 (19 black youths and 15 white youths) reveal that the proportion of African–Americans arrested for curfew violations was substantially greater than the proportion of African–Americans to the population at large.

**6.** According to Mayor Gordon and Chief of Police Ashton, police enforcement of the curfew was generally limited to occasional arrests made by individual police officers during the course of their regular duties. Police Chief Ashton remembered only one prior occasion, in 1985 or 1986, when police officers had gone out in force for the specific purpose of taking action to enforce the curfew. That enforcement action, like the enforcement action in the present case, was directed towards an establishment that was primarily used by African–Americans.

crowded, he spent no more than "two or three minutes" in each. There is no suggestion that the police explained to any other proprietor that they were undertaking a mass curfew enforcement, nor that any other methodical check for minors was made. There is no indication that a curfew arrest was made in any place except the Rainbow. Chief Ashton stated that the police issued "noise warnings" to the other Market Street restaurants.

Vanessa Brown and Tyeicka Bowens brought this action in the Circuit Court for Frederick County. In their amended complaint they named as defendants the City of Frederick, Officer Steven Scalf, "individually and in his official capacity," and Police Chief Richard Ashton, "individually and in his official capacity." The plaintiffs sought a declaratory judgment that the Frederick curfew ordinance suffered from overbreadth and infringed upon the First and Fourteenth Amendments, as well as the Maryland Declaration of Rights. Alternatively, the plaintiffs sought a declaration that the ordinance was unconstitutionally vague. In addition to a declaratory judgment, they sought an injunction against enforcement of the ordinance. The plaintiffs also asserted that, regardless of the validity of the ordinance, the defendants' actions "were perpetrated against plaintiffs as part of a pattern and practice and *de facto* policy of the Frederick City Police Department of violating the rights of African–American citizens and subjecting those citizens to disparate treatment." The plaintiffs sought damages for assault and battery, false imprisonment, invasion of privacy, intentional infliction of emotional distress, "negligence and gross negligence." In addition, they claimed damages for the violation of their rights under the "First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Maryland Declaration of Rights." [7]

---

7. The complaint also alleged violations of rights under the Thirteenth Amendment and, with respect to plaintiff Brown only, under 42 U.S.C. § 1981. Nevertheless, the plaintiffs did not pursue these claims in the trial court or in the Court of Special Appeals, and they are not before us.

After some discovery, including both depositions and answers to interrogatories, both sides filed motions for summary judgment accompanied by affidavits. The plaintiffs filed a motion for partial summary judgment on their claim that the Frederick ordinance should be declared unconstitutional. The defendants responded with a motion for summary judgment on all counts. The defendants argued that the curfew ordinance was constitutional and that, even if it were invalid, the defendants were entitled to qualified immunity on both the § 1983 and the common law damages claims.

At the conclusion of oral argument on the summary judgment motions, the trial judge orally stated that he was granting the defendants' motion for summary judgment. The judge further stated that the juvenile curfew ordinance was constitutional and could be enforced, that there had been probable cause to believe that the plaintiffs had violated the ordinance, and that, therefore, there had been probable cause for the plaintiffs' detention. In connection with the plaintiffs' § 1983 claims and the common law tort claims, the court further concluded that, even if the ordinance were invalid, the defendants were entitled to immunity from suit. The court did not address in its oral statements the plaintiffs' allegations that their constitutional rights were violated by the City of Frederick's racially discriminatory enforcement of the curfew ordinance. The circuit court did not file a written opinion or declaratory judgment. The only written order was a docket entry stating that the defendants' motion for summary judgment was granted and that the plaintiffs' motion for partial summary judgment was denied.

Upon the plaintiffs' appeal, the Court of Special Appeals reversed in part the circuit court's grant of the defendants' motion for summary judgment. The intermediate appellate court held that the curfew ordinance was unconstitutional because it "burdens the fundamental rights of minors and is not justified by any compelling governmental interest." *Brown v. Ashton*, 93 Md.App. 25, 46, 611 A.2d 599, 609 (1992). Alternatively, the Court of Special Appeals concluded that the

curfew ordinance was unconstitutionally vague. 93 Md.App. at 49, 611 A.2d at 611.

Notwithstanding that it had held the curfew ordinance invalid, the Court of Special Appeals affirmed that part of the order granting summary judgment which related to the plaintiffs' claims for damages. The intermediate appellate court based its holding with respect to the common law tort claims and the § 1983 claims on the availability of qualified immunity for the defendants. The Court of Special Appeals further held that the plaintiffs had no viable claim based on a violation of the Maryland Declaration of Rights because there had been "probable cause" for the plaintiffs' arrest and detention. Like the trial court, the intermediate appellate court did not address the plaintiffs' claims based on alleged racial discrimination, although the matter was raised in the briefs submitted to the Court of Special Appeals.

Both sides petitioned this Court for a writ of certiorari. Bowens and Brown sought review of the decisions below relating to their claims for damages. The City of Frederick challenged the Court of Special Appeals' holding that the curfew ordinance was unconstitutional. We granted both petitions.

## II.

Before reaching the substantive issues in the case, we must first address a procedural matter. Regardless of our views concerning the constitutionality of the curfew ordinance and the disposition of the plaintiffs' claims for damages, the judgment of the circuit court must be vacated. The plaintiffs sought in the circuit court a declaratory judgment with regard to the constitutionality of the Frederick curfew ordinance. Rather than declaring the rights of the parties, however, the circuit court made some oral rulings from the bench and, by an order entered on the docket, simply granted the defendants' motion for summary judgment. There was no written declaration of the parties' rights.

■ This Court has repeatedly stated that, "whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made." *Case v. Comptroller*, 219 Md. 282, 288, 149 A.2d 6, 9 (1959). Very recently, in *Christ v. Department*, 335 Md. 427, 435, 644 A.2d 34, 38 (1994), we repeated that "[w]here a controversy is appropriate for resolution by declaratory judgment . . . the trial court must render a declaratory judgment." *See also, e.g., Popham v. State Farm*, 333 Md. 136, 140 n. 2, 634 A.2d 28, 30 n. 2 (1993), citing *Broadwater v. State*, 303 Md. 461, 465–469, 494 A.2d 934, 936–938 (1985); *Turnpike Farm v. Curran*, 316 Md. 47, 49, 557 A.2d 225, 226 (1989); *Boyds Civic Ass'n v. Montgomery County*, 309 Md. 683, 687 n. 2, 526 A.2d 598, 600 n. 2 (1987); *East v. Gilchrist*, 293 Md. 453, 461 n. 3, 445 A.2d 343, 347 n. 3 (1982); *Mauzy v. Hornbeck*, 285 Md. 84, 90–92, 400 A.2d 1091, 1094–95 (1979), and cases there cited. Consequently, where a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of summary judgment in favor of the prevailing party.

In *Robert T. Foley Co. v. W.S.S.C.*, 283 Md. 140, 389 A.2d 350 (1978), the plaintiffs filed an action for a judgment declaring that certain resolutions of the Washington Suburban Sanitary Commission were unconstitutional. The trial court delivered an oral opinion and entered summary judgment in favor of the defendants. This Court in *Robert T. Foley Co. v. W.S.S.C.* agreed with the trial court that the plaintiffs' constitutional challenges to the resolutions lacked merit, but nonetheless we stated as follows (283 Md. at 154, 389 A.2d at 359):

"[I]t is clear that the circuit court erred by failing to set forth in its judgment a declaration of the parties' rights with regard to the issues raised. We shall, therefore, vacate the judgment and remand the case to the circuit court for that court to enter a new judgment which shall include a declaration of the rights of the parties. . . ."

Likewise, in the present case the circuit court erred when it failed to render a declaratory judgment.

### III.

As this Court has stated in numerous cases, a " 'statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " *Bowers v. State*, 283 Md. 115, 120, 389 A.2d 341, 345 (1978), quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). *See also, e.g., Tidewater/Havre de Grace v. Mayor of Havre de Grace*, 337 Md. 338, 349–350, 653 A.2d 468, 474 (1995); *Ayers v. State*, 335 Md. 602, 623–625, 645 A.2d 22, 32–35 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995); *Condon v. State*, 332 Md. 481, 499, 632 A.2d 753, 762 (1993); *Williams v. State*, 329 Md. 1, 8–12, 616 A.2d 1275, 1278–1280 (1992); *In re Leroy T.*, 285 Md. 508, 511–512, 403 A.2d 1226, 1227–1228 (1979); *Governor v. Exxon Corp.*, 279 Md. 410, 454, 370 A.2d 1102, 1126 (1977), *aff'd* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Vague penal statutes violate due process because "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888, 890 (1939).

In addition, a penal statute offends due process "if it fails to provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws." *Bowers v. State, supra,* 283 Md. at 121, 389 A.2d at 345, citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110, 120 (1972). *See also Williams v. State, supra,* 329 Md. at 9, 616 A.2d at 1278–1279; *In re Leroy T., supra,* 285 Md. at 512, 403 A.2d at 1228; *Miller v. Maloney Concrete Co.*, 63 Md.App. 38, 48–49, 491 A.2d 1218, 1223 (1985).

The Supreme Court has described the legislature's obligation to establish adequate guidelines for enforcement of the law as "the more important aspect of the vagueness doctrine...." *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d. 903, 909 (1983). *See also Williams v.*

*State, supra,* 329 Md. at 8–9, 616 A.2d at 1278–1279; *Miller v. Maloney Concrete Co., supra,* 63 Md.App. at 49, 491 A.2d at 1223. The Court has recognized that vague laws carry an inherent danger of arbitrary enforcement (*Smith v. Goguen,* 415 U.S. 566, 578, 94 S.Ct. 1242, 1249–1250, 39 L.Ed.2d 605, 615 (1974)):

> "This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause. The deficiency is particularly objectionable in view of the unfettered latitude thereby accorded law enforcement officials and triers of fact."

In light of these principles, the Frederick curfew ordinance is unconstitutionally vague.[8]

Section 15–10 sweeps broadly, barring minors from "remain[ing] in or upon any public place," any privately owned business, or any place of amusement or entertainment open to the public, during the curfew hours. Frederick City Code §§ 15–9(c), 15–10. An exception to § 15–10 is made, however, for minors accompanied by their parents, for minors running errands for their parents, for minors working during the curfew hours, and for any "child attending a cultural, scholastic, athletic or recreational activity supervised by a bona fide organization. . . ." § 15–11. The curfew ordinance authorizes penalties against young people, their parents and others for curfew infractions. Consequently, due process requires that the public and the police be able to tell with reasonable certainty whether or not a young person's nighttime excursion violates the curfew, or whether it falls within the curfew exceptions. It must be possible for citizens to decide whether an unaccompanied seventeen year old might be detained in Frederick under the curfew ordinance for attending a midnight church service, a baseball game that ran into extra innings,[9] a concert at Hood College, or a movie that ended after eleven.

---

8. Because of this holding, we need not and do not reach any other ground urged by the plaintiffs for the invalidity of the ordinance.

9. Frederick is home to the Frederick Keys professional baseball team.

"Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222, 228–229 (1972). Accordingly, this Court has stated that "[a] statute is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning." *Bowers v. State, supra,* 283 Md. at 125, 389 A.2d at 347.

The plaintiffs contend that the exception in the Frederick City curfew ordinance for events "supervised by a bona fide organization" is unconstitutionally vague. We have not found any judicial determination, from Maryland or elsewhere, that explains the meaning of the phrase "bona fide organization" in a similar context. The common law does not fix a meaning for the term.

It appears, however, that both "bona fide" and "organization" are very broad terms whose meanings are generally defined in part by the context in which they are used. *See, e.g., Bradley v. Saxbe,* 388 F.Supp. 53, 57 (D.D.C.1974) (limiting "organization" to business, professional and philanthropic organizations in a lobbying context); *Newton Evangelistic Assoc. v. S.C. Emp. Sec. Comm.,* 284 S.C. 302, 306, 326 S.E.2d 165, 167 (Ct.App.1985) (holding that a religious "organization" is "composed of persons sharing common tenets, precepts, purposes and beliefs" for purposes of employment security contribution exemptions); *Farmers Insurance Exchange v. Jones,* 30 Utah 2d 211, 515 P.2d 1275 (1973) (including the United States within definition of "organization" in a trust agreement requiring an insured to collect damages from "organizations"). *See also People v. Terry,* 720 P.2d 125, 127 (Colo.1986) (holding that action is taken for a "bona fide medical purpose" if it is "taken in good faith, honestly, and sincerely in the course of investigating, preventing, alleviating, or curing a disease or malady"); *People v. Latsis,* 195 Colo. 411, 414, 578 P.2d 1055, 1057–1058 (1978) (giving a dictionary

definition of "bona fide" in construing "bona fide acts" of law enforcement personnel as acts taken in good faith).

The only aspect of Frederick's curfew ordinance that supplies a narrowing context for the phrase "bona fide organization" is the requirement that such an organization be capable of supervising a cultural, scholastic, athletic or recreational activity. Since almost any association of individuals would be capable of such a task, the context of the term "bona fide organization" sheds no light on the meaning of the curfew ordinance by narrowing the scope of the ambiguous phrase.

Dictionary definitions of "bona fide" and "organization" are equally broad. Black's Law Dictionary (6th ed. 1990), defines "bona fide" as follows:

> "In or with good faith; honestly, openly, and sincerely; without deceit or fraud.... Truly; actually; without simulation or pretense. Innocently; in the attitude of trust and confidence; without notice of fraud, etc. Real, actual, genuine, and not feigned." [10]

"Organization" is defined in a commercial law context in Black's Law Dictionary.[11] Random House offers a more general definition: "Something that is organized ... a group of persons organized for some end or work; association." Thus, dictionary definitions of "bona fide organization" can be applied so as to encompass any honest group of individuals in Frederick capable of supervising a cultural or recreational event. In particular, the Buseys' entertainment business, or

---

**10.** Similar, although less comprehensive, definitions appear in Webster's Third New International Dictionary (1976), and in the Random House Dictionary (2d ed. 1977). Webster's defines "bona fide" as "made in good faith without fraud or deceit ... legally valid ... made with earnest or wholehearted intent ... not specious or counterfeit...." Random House's definition is shorter: "made, done, presented, etc., in good faith; without deception or fraud ... authentic; true."

**11.** The definition reads as follows:

> "As term is used in commercial law, includes a corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, two or more persons having a joint or common interest, or any other legal or commercial entity."

Mr. and Mrs. Chi's restaurant business, or the combination of both, all fit within the broad, dictionary meaning of "bona fide organization."

A vagueness challenge may also be met by resort to the "common and generally accepted meaning" of the statutory language itself, if such a meaning is discernible. *Bowers v. State, supra,* 283 Md. at 125, 389 A.2d at 347. In the present case, the absence of a commonly accepted meaning is shown by the several conflicting interpretations of "bona fide organization" offered in good faith by the parties through the course of the litigation. The plaintiffs have contended throughout that the dance at the Rainbow was supervised by a bona fide organization. By contrast, the Chief of Police, Richard Ashton, was certain that neither the Rainbow as an entity, nor its owners, nor the Buseys, could be a "bona fide organization" within the meaning of the curfew ordinance. In Chief Ashton's mind, a "bona fide organization" was one that operated without a profit-making motive. He stated:

> "[Restaurants and bars are] in business for profit. To sell alcohol, to sell food, and to have a live band there. They're not somebody who's going to take an interest in your child. Your minor child. I mean, if it's YMCA or Boy Scouts, Girl Scouts, what have you, you know, their purpose in having a dance is to provide kids with recreation. And, I mean, not to provide them with food and booze and the music. And I mean, these are people there that make money and the way I see a bona fide organization is somebody that's putting on an activity for kids and they're going to care about the kids. It's going to be chaperoned and you can feel relatively safe sending your child there."

Mayor Gordon provided yet another interpretation of the ordinance. He considered a "bona fide organization" to be one "that is certified under some previously announced regulation, previously announced group or certification that it is a bona fide organization." By contrast, the City Attorney defined the disputed phrase for this Court as follows (City's brief as petitioner at 19):

"In the context of the Frederick Curfew Ordinance, the phrase 'bona fide organization' clearly refers to a legitimate association of some type which would supervise the kinds of activities [cultural, scholastic, athletic or recreational activities] specifically delineated in the Ordinance."

In light of the conflicting meanings ascribed to "bona fide organization" by the plaintiffs, the Police Chief, the Mayor, and the City Attorney, we do not understand how a seventeen year old planning to attend a midnight church service, a professional baseball game, a late concert or a movie could tell whether he or she was participating in an event "supervised by a bona fide organization" or whether he or she might be taken into police custody as a child in need of supervision. The ordinance does not allow such person to "choose between lawful and unlawful conduct." *Bowers v. State, supra,* 283 Md. at 121, 389 A.2d at 345.

In addition, the curfew ordinance "fails to provide legally fixed standards and adequate guidelines for [those] . . . whose obligation it is to enforce, apply and administer the penal laws." *Ibid.* In the present case, Chief Ashton purported to implement the curfew enforcement action at the Rainbow on the basis of his singular determination that a "bona fide organization" was one without a profit-making motive.[12] The Frederick ordinance provided no clear standards within which the Police Chief was obliged to act.

We conclude, therefore, that the ordinance is facially unconstitutional. Because of its vagueness, the ordinance violates both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

## IV.

The City has contended that any invalid portion of the curfew ordinance should be severed so that the remaining portion may be enforced. We have held that the provision in

---

12. We have found no similar interpretation of "bona fide" in any source.

the ordinance providing an exception for minors attending certain events supervised by bona fide organizations is unconstitutionally vague. According to the City, this exception should be severed in its entirety.

In *Turner v. State*, 299 Md. 565, 576–577, 474 A.2d 1297, 1302–1303 (1984), this Court reviewed the principles of severability applicable to a prohibitory statute with an invalid exception:

"The primary focus in questions of severability is legislative intent. The intent to be ascertained, however, is not actual legislative intent, as the Legislature obviously intended to enact the statute as written in its entirety. Rather, when severability is the issue, the courts must look to what would have been the intent of the legislative body, if it had known that the statute could be only partially effective. In determining this legislative intent, in addition to considering the legislative history of an act, courts apply certain established principles of construction. Perhaps the most important of these principles is the presumption, even in the absence of an express clause or declaration, that a legislative. body generally intends its enactments to be severed if possible. Moreover, when the dominant purpose of an enactment may largely be carried out, notwithstanding the statute's partial invalidity, courts will generally hold the valid portions severable and enforce them. Nevertheless, when the [legislative body] enacts a prohibition with an excepted class that is subsequently found to be constitutionally infirm, ordinarily it will not be presumed that the [legislative body] would have enacted the prohibition without the exception. Such a presumption would extend the prohibition to a class of person whom the [legislative body] clearly intended should not be reached. *Davis v. State*, 294 Md. 370, 383, 451 A.2d 107, 114 (1982); *Cities Service Co. v. Governor*, 290 Md. 553, 575, 431 A.2d 663, 675 (1981); *Wheeler v. State*, 281 Md. 593, 607, 380 A.2d 1052, 1061 (1977), *cert. denied*, 435 U.S. 997, 98 S.Ct. 1650, 56 L.Ed.2d 86 (1978); *State v. Schuller*, 280 Md. 305, 319, 372 A.2d 1076, 1083 (1977)."

*See also Board v. Smallwood,* 327 Md. 220, 245–246, 608 A.2d 1222, 1234–1235 (1992); *Sugarloaf Citizens Assoc. v. Gudis,* 319 Md. 558, 573–574, 573 A.2d 1325, 1333 (1990); *Anne Arundel County v. Moushabek,* 269 Md. 419, 427–429, 306 A.2d 517, 522–523 (1973); *City of Baltimore v. Stuyvesant Co.,* 226 Md. 379, 390, 174 A.2d 153, 159 (1961); *Baltimore v. A.S. Abell Co.,* 218 Md. 273, 290–291, 145 A.2d 111, 120 (1958); *Curtis v. Mactier,* 115 Md. 386, 398–399, 80 A. 1066, 1070 (1911).

 The juvenile curfew ordinance at issue in the present case imposes broad restrictions upon the activities of Frederick's younger citizens. In light of this fact, the Frederick City Council specifically enumerated a number of exceptions to the curfew.[13] Severing the invalid exception would extend the curfew to cover situations which the City Council intended to exclude from its scope, and would partially defeat the clear purpose of the ordinance. Accordingly, it would be inappropriate for this Court to sever the invalid exception in its entirety.[14]

 At oral argument in this Court, the City made the alternative suggestion that only the expression "bona fide" should be severed. Under such an interpretation, the juvenile curfew ordinance would not apply to any minor who attended a cultural, scholastic, athletic or recreational event supervised by an organization. As we explained above, the term "organi-

---

**13.** The City suggests in its brief that the § 15–11 exception clause is essential to the curfew ordinance because, without it, the ordinance might be void as unconstitutionally overbroad. (City's brief as appellant at 20, citing *Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981)). While we do not in this case decide the question of overbreadth, the City's argument does suggest a further reason why § 15–11 is not severable from the remainder of the curfew ordinance.

**14.** The fact that the Frederick City Code contains a general severability provision, § 1–6, does not compel the opposite conclusion. In this connection, this Court has stated that "a severability clause of this sort adds little to the basic presumption of severability, for such a 'clause is merely declaratory of an established rule of construction; it is an aid merely, not an inexorable command.'" *Sugarloaf Citizens Assoc. v. Gudis,* 319 Md. 558, 574 n. 11, 573 A.2d 1325, 1333 n. 11 (1990).

zation" is a general one which could, within the context of the curfew ordinance, describe almost any association of individuals or entities. Consequently, severing the term "bona fide" from the provision might broaden the exception to the point that most activities would fall within the exception and few activities would be subject to the curfew. Such a construction of the ordinance is plainly inconsistent with the legislative intent which originally prompted the enactment of the curfew. Thus, the term "bona fide" is not severable from the remainder of the exception clause. *Compare: Porten Sullivan Corp. v. State,* 318 Md. 387, 410, 568 A.2d 1111, 1122 (1990); *State v. Burning Tree Club, Inc.,* 315 Md. 254, 297, 554 A.2d 366, 387–388, *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); *Turner v. State, supra,* 299 Md. at 576–577, 474 A.2d at 1302–1303; *Davis v. State,* 294 Md. 370, 383, 451 A.2d 107, 114 (1982), and cases there cited.

Since neither the invalid exception to the curfew ordinance nor the qualifying term "bona fide" is severable, no portion of the unconstitutional juvenile curfew ordinance may be enforced.

## V.

In their complaint in the circuit court, Bowens and Brown contended that, since the curfew ordinance was facially unconstitutional, their detention pursuant to the ordinance was likewise unconstitutional. Bowens and Brown sought damages based on violations of both the Maryland Declaration of Rights and the federal constitution.

## A.

As we have explained, the trial court held the curfew ordinance constitutional and rejected the plaintiffs' damages claims. The Court of Special Appeals, while it held the curfew ordinance unconstitutional, nevertheless concluded that the plaintiffs had no cause of action for damages. The intermediate appellate court agreed with the trial court that the arresting officer had probable cause to arrest the plaintiffs. The

appellate court continued as follows (*Brown v. Ashton, supra,* 93 Md.App. at 53, 611 A.2d at 613):

"[W]e hold here ... that if a police officer has probable cause to arrest a person (like Bowens or Brown here), there is no basis upon which that person can assert that a search or seizure pursuant to that lawful arrest is unconstitutional."

Thus, according to the Court of Special Appeals, even though the plaintiffs were detained by employees of the City for engaging in conduct which the City had not constitutionally prohibited, the plaintiffs' detention did not violate their rights under either the federal constitution or the Maryland Declaration of Rights.

■■■ Contrary to the position of the Court of Special Appeals, neither the federal nor the state constitution permits a governmental body to arrest and detain its citizens pursuant to unconstitutional legislative enactments. The Court of Special Appeals focussed its analysis too narrowly when it characterized the plaintiffs' federal and state constitutional claims as exclusively claims of improper search and seizure. 93 Md. App. at 52–53, 611 A.2d at 612–613. Even if we assume, *arguendo,* that there was probable cause for the plaintiffs' arrest, the plaintiffs were nonetheless detained on an unconstitutional basis. As the Court of Special Appeals itself recognized, 93 Md.App. at 46–47, 611 A.2d at 609–610, a vague penal statute violates citizens' rights to due process of law, rights protected by the Fourteenth Amendment and by Article 24 of the Maryland Declaration of Rights. *See, e.g., Kolender v. Lawson, supra,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903; *Papachristou v. City of Jacksonville, supra,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110; *Lanzetta v. New Jersey, supra,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; *Connally v. General Construction Co., supra,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; *Tidewater v. Mayor of Havre de Grace, supra,* 337 Md. at 350 n. 9, 653 A.2d at 475 n. 9; *Ayers v. State, supra,* 335 Md. 602, 645 A.2d 22; *Condon v. State, supra,* 332 Md. 481, 632 A.2d 753; *Williams v. State, supra,* 329 Md. 1, 616 A.2d 1275; *In re Leroy T., supra,* 285 Md. 508, 403 A.2d 1226; *Governor v. Exxon Corp., supra,* 279 Md. 410, 370 A.2d 1102.

Consequently, regardless of the propriety of the plaintiffs' arrest under the Fourth Amendment and Article 26 of the Maryland Declaration of Rights, when the City of Frederick detained the plaintiffs for violating its unconstitutional curfew ordinance, it denied the plaintiffs their right to due process of law. In addition, considering the plaintiffs' assertions and evidence that the ordinance was enforced in a racially discriminatory manner, the City may have denied the plaintiffs their right to the equal protection of the laws.

Both the trial court and the Court of Special Appeals limited their analysis of the plaintiffs' allegations of constitutional injury to injuries that might arise under the Fourth Amendment and Article 26 of the Maryland Declaration of Rights, apparently assuming that the unconstitutionality of an arrest is governed solely by these provisions. Nevertheless, an arrest may be constitutionally improper because it violates other constitutional rights. Even though a police officer may have probable cause to believe that a person has violated a penal statute, and thus makes an arrest, if the statute itself is unconstitutional or has been unconstitutionally applied, the arrestee's constitutional rights have been violated. In the present case, the plaintiffs alleged that their arrests violated their rights to due process of law and to the equal protection of the laws. Certainly, an arrest which is inconsistent with these constitutional guarantees is an unconstitutional arrest. *See, e.g., Griffin v. Maryland,* 378 U.S. 130, 137, 84 S.Ct. 1770, 1773–1774, 12 L.Ed.2d 754, 758–759 (1964) (holding that the deputy sheriff "arrested [petitioners] ... because they were Negroes. This was state action forbidden by the [Equal Protection Clause of] the Fourteenth Amendment"); *Gainor v. Rogers,* 973 F.2d 1379, 1388 (8th Cir.1992) (the plaintiff, who was arrested for carrying a large wooden cross, had alleged a violation of his First Amendment rights); *Buffkins v. City of Omaha,* 922 F.2d 465 (8th Cir.1990) (arrest violated the First Amendment), *cert. denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991); *Valle v. Stengel,* 176 F.2d 697 (3d Cir.1949) (equal protection); *Elbrader v. Blevins,* 757 F.Supp. 1174, 1181–1183 (D.Kan.1991) (free speech); *Smith v.*

*City of Montgomery,* 251 F.Supp. 849 (M.D.Ala.1966) (equal protection).

Since we hold that the plaintiffs' arrest and detention violated their due process rights under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights, and may have violated their equal protection rights under the Fourteenth Amendment and Article 24, we need not in addition consider whether their arrest also infringed upon rights guaranteed under the Fourth Amendment and Article 26 of the Maryland Declaration of Rights.[15] Instead, we shall address

---

**15.** In disposing of the plaintiffs' constitutional claims for damages on Fourth Amendment grounds, the Court of Special Appeals relied on *Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). While we do not decide whether the plaintiffs in the present case alleged a violation of their rights under the Fourth Amendment, we note that *Michigan v. DeFillippo* is not dispositive of the issue. *DeFillippo* was a criminal case involving the application of the exclusionary rule. The Supreme Court in *DeFillippo* held that the rule did not require the exclusion of evidence seized during a search incident to arrest, where the arrest was based on the violation of an ordinance subsequently held unconstitutional. The Court in *DeFillippo* relied, *inter alia,* for its exclusionary rule holding on *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), a § 1983 immunity case. To the extent that the *DeFillippo* opinion might be pertinent to the issues here, it would seem to relate to the scope of immunity under § 1983, rather than to whether the plaintiffs' Fourth Amendment rights were violated. Most lower courts and commentators have recognized that *DeFillippo* addresses the scope of the exclusionary rule, rather than of the Fourth Amendment itself. *See Holifield v. Davis,* 662 F.2d 710, 711 (11th Cir.1981), *cert. denied,* 455 U.S. 1026, 102 S.Ct. 1730, 72 L.Ed.2d 147 (1982); *United States v. Williams,* 622 F.2d 830, 841, 843 (5th Cir.1980), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981); *State v. White,* 97 Wash.2d 92, 109, 640 P.2d 1061, 1070 (1982); Elizabeth P. Marsh, *On Rollercoasters, Submarines and Judicial Shipwrecks: Acoustic Separation and the Good Faith Exception to the Fourth Amendment Exclusionary Rule,* 1989 U.Ill.L.Rev. 941, 963 n. 130, 1009–1010 (1989); Craig M. Bradley, *Two Models of the Fourth Amendment,* 83 Mich.L.Rev. 1468, 1469, and n. 9 (1985); *The Supreme Court, 1978 Term,* 93 Harv.L.Rev. 1, 181, 185 (1979). *But see* Richard E. Gifford, *Constitutional Law: Search and Seizure—The Role of Police Officer Good Faith in Substantive Fourth Amendment Doctrine—*Michigan v. DeFillippo, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), 55 Wash.L.Rev. 849 (1980).

Moreover, even in its exclusionary rule cases, the Supreme Court does not appear to have taken a consistent approach to the effect of unconstitutional enactments. *Compare Ybarra v. Illinois,* 444 U.S. 85,

whether the plaintiffs' constitutional injuries can support their cause of action for damages.

 As both the trial court and the Court of Special Appeals recognized in the present case, different principles govern the availability of compensatory damages for violations of the state and federal constitutions. A federal statute, 42 U.S.C. § 1983, permits citizens to recover damages when state or local officials violate rights guaranteed by the federal constitution. *See Wyatt v. Cole*, 504 U.S. 158, 161–163, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504, 511 (1992); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258, 101 S.Ct. 2748, 2755, 69 L.Ed.2d 616, 626 (1981); *Allen v. McCurry*, 449 U.S. 90, 98–99, 101 S.Ct. 411, 417, 66 L.Ed.2d 308, 316 (1980). By contrast, a violation of Article 24 of the Maryland Declaration of Rights may be redressed through a common law action for damages. *See Ritchie v. Donnelly*, 324 Md. 344, 369–373, 597 A.2d 432, 444–446 (1991), and cases there cited. Because of the different principles involved, we shall consider separately the plaintiffs' claims for damages under the state and federal constitutions.

### B.

 As previously discussed, the plaintiffs' detention pursuant to the unconstitutional juvenile curfew ordinance violated their due process rights under Article 24 of the Maryland Declaration of Rights.[16] Furthermore, the plaintiffs' evidence

---

100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (applying exclusionary rule where a search allegedly authorized by state search and seizure statute was in fact unconstitutional) *with Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (refusing to apply exclusionary rule where police acted in reliance on a statute, later declared unconstitutional, which authorized warrantless searches).

**16.** Article 24 provides as follows:

"**Article 24. Due Process.**

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

regarding racial discrimination appears to be sufficient to present a triable issue concerning a violation of their rights protected by the equal protection component of Article 24.[17] It is well established that when an individual suffers a violation of rights protected under Article 24, "he may enforce those rights by bringing a common law action for damages." *Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 537–538, 479 A.2d 921, 930 (1984). *See also, e.g., Ritchie v. Donnelly, supra,* 324 Md. at 369–370, 597 A.2d at 444–445; *Clea v. City of Baltimore, supra,* 312 Md. at 679, 541 A.2d at 1311; *Weyler v. Gibson,* 110 Md. 636, 653–654, 73 A. 261, 263–264 (1909).

In the present case, the plaintiffs named as defendants the City of Frederick, the Chief of Police, and the individual police officer who arrested Vanessa Brown. Neither the trial court nor the Court of Special Appeals distinguished between the municipal and individual defendants in their constitutional analysis. Nonetheless, separate considerations apply to the potential liability of these defendants.

 The City of Frederick itself, in enacting and enforcing the unconstitutional ordinance, was directly responsible for the plaintiffs' constitutional injury. Maryland law provides no immunity for municipalities and other local government entities from suits based upon violations of state constitutional rights. In *Clea v. City of Baltimore, supra,* 312 Md. at 667, 541 A.2d at 1305, this Court set forth the general rule that a municipality is ordinarily immune from tort suits with respect to its "governmental" activities but not with respect to "proprietary" activities. Nevertheless, we went on to state as follows (312 Md. at 667 n. 3, 541 A.2d at 1305 n. 3):

---

**17.** While Article 24 contains no express equal protection clause, it nonetheless has been construed to guarantee all persons the equal protection of the laws. *See Maryland Aggregates v. State,* 337 Md. 658, 671 n. 8, 655 A.2d 886, 893 n. 8 (1995); *Verzi v. Baltimore County,* 333 Md. 411, 417, 635 A.2d 967, 969–970 (1994); *Murphy v. Edmonds,* 325 Md. 342, 353–354, 601 A.2d 102, 107 (1992), and cases there cited.

"The governmental-proprietary distinction has not been applied, however, when local governments have been sued for violations of constitutional rights. In that situation, there is ordinarily no local governmental immunity. *See, e.g., Hebron Sav. Bk. v. City of Salisbury,* 259 Md. 294, 269 A.2d 597 (1970); *Jarvis v. Baltimore City,* 248 Md. 528, 534–535, 237 A.2d 446 (1968); *Burns v. Midland,* 247 Md. 548, 234 A.2d 162 (1967)."

*Accord: Board v. Town of Riverdale,* 320 Md. 384, 389–390, 578 A.2d 207, 210 (1990).

 Furthermore, it would be inappropriate to grant the municipality immunity under the circumstances presented here for the reasons enunciated by the Supreme Court in *Owen v. City of Independence,* 445 U.S. 622, 654–655, 100 S.Ct. 1398, 1417, 63 L.Ed.2d 673, 695–696 (1980):

"It hardly seems unjust to require a municipal defendant which has violated a citizen's constitutional rights to compensate him for the injury suffered thereby.... [E]ven where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated."

Consequently, the plaintiffs have a cause of action for damages against the City of Frederick based on the City's violation of their rights under Article 24.

In addition, the plaintiffs sued two individual defendants, Richard Ashton and Steven Scalf. Our recent cases have reaffirmed the longstanding principle that Maryland law ordinarily provides no immunity to public officials sued for violating state constitutional rights. *Ritchie v. Donnelly, supra,* 324 Md. at 369–373, 597 A.2d at 444–446; *Clea v. City of Baltimore, supra,* 312 Md. at 680, 541 A.2d at 1312; *Mason v. Wrightson,* 205 Md. 481, 486–487, 109 A.2d 128, 130–131 (1954); *Heinze v. Murphy,* 180 Md. 423, 429, 433–434, 24 A.2d

917, 920, 922–923 (1942); *Weyler v. Gibson, supra,* 110 Md. at 654, 73 A. at 263.

In *Ritchie v. Donnelly, supra,* 324 Md. at 369–371, 597 A.2d at 444, this Court explained why the immunity of the state could not shield public officials from liability for their actions in violation of the state constitution:

"The theory that, in the absence of a statute, the State itself cannot be held liable in damages for acts which are unconstitutional rests on public policy and a theoretical notion of the 'State.' *Weyler v. Gibson, supra,* 110 Md. at 654, 73 A. at 263. In *Dunne v. State,* [162 Md. 274, 284–285, 159 A. 751, 755, *cert. denied,* 287 U.S. 564, 53 S.Ct. 23, 77 L.Ed. 497 (1932)], the Court reaffirmed the principle, saying: 'The "State" spoken of in this rule [of sovereign immunity] "itself is an ideal person, intangible, invisible, immutable," ' which can ' "act only by law, [and] whatever it does say and do must be lawful." ' When the State's agents act wrongly, their acts are ultra vires, and it is ' "the mere wrong and trespass of those individual persons. . . ." ' The principle that the State cannot be held liable in damages does not extend to those public officials who, 'under color of their office, . . . have injured one of the state's citizens,' *Dunne v. State, supra,* 162 Md. at 285, 159 A. at 755. To do so would be to 'create a privileged class, free from liability for wrongs inflicted or injuries threatened.' *Ibid.*"

The Court in *Ritchie* recognized that immunity from suits based on a violation of the Maryland Constitution has been denied consistently, summarizing the law as follows (324 Md. at 370–371, 597 A.2d at 445):

"This Court has consistently held that a public official who violates the plaintiff's rights under the Maryland Constitution is personally liable for compensatory damages. *Clea v. City of Baltimore, supra,* 312 Md. at 680, 541 A.2d at 1312; *Mason v. Wrightson,* 205 Md. 481, 109 A.2d 128 (1954); *Heinze v. Murphy,* 180 Md. 423, 24 A.2d 917 (1942); *Weyler v. Gibson, supra,* 110 Md. at 654, 73 A. at 263. *See also Dunne v. State, supra. . . .* Liability has been imposed

upon the government official when his unconstitutional actions were in accordance with or dictated by governmental policy or custom. Liability has also been imposed when the unconstitutional acts were inconsistent with governmental policy or custom."

Earlier, this Court in *Clea v. City of Baltimore, supra,* 312 Md. at 679–685, 541 A.2d at 1311–1314, reviewed a series of cases, including *Weyler v. Gibson, Mason v. Wrightson* and *Heinze v. Murphy,* which held that "a public official who violates a plaintiff's rights under the Maryland Constitution is entitled to no immunity." 312 Md. at 680, 541 A.2d at 1312. In *Clea,* we examined the "sound reasons underlying the position taken by the prior decisions of the Court" and held, in accordance with our earlier cases, that the individual defendant who had violated the plaintiffs' state constitutional rights was entitled to no immunity. *Ibid.*

 Each of our prior cases rejecting a public official's claim of immunity, in an action based upon a deprivation of state constitutional rights, has involved a state official or employee.[18] This is the first case to reach this Court involving the liability of a local government official for a state constitutional tort and a claim of immunity. Moreover, in the present case the local government entity responsible for the constitutional violation is a defendant. In addition, the General Assembly has recently enacted the Local Government Tort Claims Act, which shifts financial liability for wrongs committed by local government officials, acting in the scope of their employment and without malice, from the public officials to the local government entity itself. *See* Code (1974, 1995 Repl.Vol.), § 5–403(b) of the Courts and Judicial Proceedings Article.

---

**18.** Three of the cases, *Clea v. City of Baltimore, Mason v. Wrightson* and *Heinze v. Murphy,* involved Baltimore City police officers. The Baltimore City Police Department, for·purposes of Maryland law, is a state agency. *See Clea v. City of Baltimore, supra,* 312 Md. at 668, 541 A.2d at 1306.

■ As previously indicated, the individual state defendants in *Ritchie, Clea, Mason* and *Weyler* each argued that they should be entitled to immunity from suits based on state constitutional violations. In each case, this Court rejected the argument. We explained in *Clea* why governmental immunity, which plays an important role in many tort actions against government entities or officials, ordinarily has no proper place in actions involving violations of the Maryland Constitution (312 Md. at 684–685, 541 A.2d at 1314):

"The purpose of a negligence or other ordinary tort action is not specifically to protect individuals against government officials or to restrain government officials. The purpose of these actions is to protect one individual against another individual, to give one person a remedy when he is wrongfully injured by another person. Issues of governmental immunity in this context concern whether, and to what extent, as a policy matter, a governmental official or entity is to be treated like an ordinary private party. *See James v. Prince George's County,* [288 Md. 315, 329–336, 418 A.2d 1173, 1181–1185 (1980) ].

"On the other hand, constitutional provisions like Articles 24 or 26 of the Maryland Declaration of Rights, or Article III, § 40, of the Maryland Constitution, are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions. It would also ... largely render nugatory the cause of action for violation of constitutional rights recognized in *Widgeon, Mason, Heinze, Weyler,* and other cases."

Thus, the principle that individual state officials should not be immune from suit for state constitutional violations is bound up with the basic tenet, expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong. In *Weyler v. Gibson, supra,* 110 Md. at 653–654, 73 A. at 263, this Court explained its holding that the Warden of the

Maryland Penitentiary was liable to the plaintiffs in damages for an unconstitutional taking of their property:

"Our Declaration of Rights (Article 19) declares that every man for any injury done to him in his person or property ought to have remedy by the course of the law of the land, and (Article [24]) that no man ought to be deprived of his property, but by the judgment of his peers, or by the law of the land, and section 40, Article 3 of the Constitution prohibits the passing of any law authorizing private property to be taken for public use, without just compensation ...

\* \* \* \* \* \*

"It is conceded that no suit can be brought against the State, without its consent. This immunity of the State from suit rests upon grounds of public policy, and is too firmly fixed in our law to be questioned. But it would be strange indeed, in the face of the solemn constitutional guarantees, which place private property among the fundamental and indestructible rights of the citizen, if this principle could be extended and applied so as to preclude him from prosecuting an action of ejectment against a State Official unjustly and wrongfully withholding property, by the mere fact that he was holding it for the State and for State uses."

Unlike the cases discussed above, the present action involves a situation in which the Article 19 guarantee of redress does not depend upon the availability of a remedy in damages against the individual government actors who performed the unconstitutional act. The City of Frederick is also a defendant and participated in this case. As previously discussed, a local government entity, unlike the State of Maryland, enjoys no immunity from actions based on violations of the state constitution. The City of Frederick enacted and ordered the enforcement of the unconstitutionally vague ordinance, whereas the individual public officers who arrested the plaintiffs committed a constitutional tort because of the performance of their duties in the service of the City. Moreover, the allegations and evidence submitted by the plaintiffs in an effort to

show that the ordinance was enforced in a racially discriminatory manner indicated policy decisions at the highest municipal level; the alleged manner of enforcement would appear to have been a matter of municipal policy. *Cf. Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

As earlier mentioned, the Local Government Tort Claims Act, Maryland Code (1974, 1995 Repl.Vol.), §§ 5–401 through 5–404 of the Courts and Judicial Proceedings Article, makes local governments, including municipalities, liable for judgments for damages awarded against their officers and employees for tortious acts committed within the scope of employment and without malice.[19] The purpose of the legisla-

---

**19.** The extent and limits of the local government's liability are set forth in §§ 5–402 and 5–403 as follows:

**"§ 5–402. Nature and extent of legal representation.**

"(a) *Government to provide legal defense to employees.*—Each local government shall provide for its employees a legal defense in any action that alleges damages resulting from tortious acts or omissions committed by an employee within the scope of employment with the local government.

(b) *Immunity; exceptions.*—(1) Except as provided in paragraph (2) of this subsection, a person may not execute against an employee on a judgment rendered for tortious acts or omissions committed by the employee within the scope of employment with a local government.

(2)(i) An employee shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice.

(ii) In such circumstances the judgment may be executed against the employee and the local government may seek indemnification for any sums it is required to pay under § 5–403(b)(1) of this subtitle.

\* \* \* \* \* \*

**"§ 5–403. Liability of government; defenses.**

\* \* \* \* \* \*

"(b) *When government liable.*—(1) Except as provided in subsection (c) of this section, a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

(c) *Punitive damages; indemnification.*—(1) A local government may not be liable for punitive damages.

tion is to provide a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.

Consequently, on remand, the plaintiffs are entitled to a trial on their claims for damages based on the violations of their rights under Article 24 of the Maryland Declaration of Rights. Any judgments rendered should, under the Local Government Tort Claims Act, be paid by the City and not by the individual defendants.

## C.

The plaintiffs have also asserted a cause of action for damages based on violations of the federal constitution, relying on the Civil Rights Act of 1871, 42 U.S.C. § 1983.[20]

---

(2)(i) Subject to subsection (a) of this section and except as provided in subparagraph (ii) of this paragraph, a local government may indemnify an employee for a judgment for punitive damages entered against the employee.

(ii) A local government may not indemnify a law enforcement officer for a judgment for punitive damages if the law enforcement officer has been found guilty under Article 27, § 731 of the Code as a result of the act or omission giving rise to the judgment.

(3) A local government may not enter into an agreement that requires indemnification for an act or omission of an employee that may result in liability for punitive damages."

The parties in this case have not, at any time, raised an issue concerning the direct applicability of the Local Government Tort Claims Act to this case. Both sides have ignored the statute. Nevertheless, there is no exception in the Local Government Tort Claims Act for constitutional torts. In fact, there is no exception in the statutory language for any category of torts. As long as the local government employee is acting in the scope of his employment and without malice, the local government is required to pay the judgment against the employee to the extent it represents compensatory damages, up to certain statutory limits. The statute does contain certain procedural requirements which can be waived. *See* § 5–404(c). The parties in this case would appear to have waived the procedural requirements.

**20.** The applicable portion of § 1983 provides as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

Section 1983 authorizes plaintiffs to recover damages when officials acting under color of state law violate federally created rights. *See Howlett by and through Howlett v. Rose*, 496 U.S. 356, 358, 110 S.Ct. 2430, 2433, 110 L.Ed.2d 332, 342 (1990); *Ritchie v. Donnelly, supra*, 324 Md. at 354, 597 A.2d at 436. During the colloquy with the parties' attorneys at the hearing on the motions for summary judgment, the trial court articulated two alternative grounds for its holding with respect to the plaintiffs' § 1983 claims. The trial court stated both that there had been no violation of federal constitutional rights because, in the court's view, the curfew ordinance was constitutional and the police officers had probable cause to believe that the plaintiffs had violated the ordinance. Nevertheless, the trial court went on to state that, even if there were a constitutional violation under the circumstances, "you still have the good faith immunity.... The defendants' motion for summary judgment is also granted on that ground."

As discussed earlier, the trial court's first basis for granting summary judgment in favor of the defendants on the § 1983 counts was erroneous because the plaintiffs' arrest and detention under the unconstitutionally vague ordinance violated their rights to due process of law guaranteed by the Fourteenth Amendment. Moreover, reviewing the facts most favorably for the plaintiffs, the enforcement of the ordinance may have been discriminatory and in violation of the plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

The trial court's alternative basis for granting the defendants' summary judgment motion was also incorrect. For the reasons explained below, there is no basis in this case for recognizing qualified immunity under § 1983. Consequently, we must vacate the summary judgments entered in favor of the defendants on the § 1983 counts. Nonetheless, it seems

---

Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

that the trial court did not apply certain principles which are pertinent to suits under § 1983. Consequently, in light of our remand of the case, and for the guidance of the trial court, we shall summarize the law governing the plaintiffs' § 1983 claims.

 This Court explained in *Ritchie v. Donnelly, supra,* 324 Md. at 354, 597 A.2d at 437, that "§ 1983 authorizes an action against a 'person' only." Accordingly, the plaintiffs must establish that each named defendant is a "person" within the meaning of § 1983. In their complaint, Bowens and Brown named as defendants the City of Frederick, Officer Steven Scalf "individually and in his official capacity," and Chief of Police Richard Ashton "individually and in his official capacity."

 The City of Frederick is a municipality, and, as such, a unit of local government. In *Ritchie v. Donnelly, supra,* 324 Md. at 356, 597 A.2d at 438, the Court described the contours of local government liability under § 1983:

> "Local governments, unlike state governments, are 'persons' under § 1983 and can be sued for money damages under § 1983 when governmental law, policy or custom contributed to the violation of federal constitutional or statutory rights. *Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 690–695, 98 S.Ct. 2018, 2035–2038, 56 L.Ed.2d 611, 635–638 (1978). *See, e.g., City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *De Bleecker v. Montgomery County,* 292 Md. 498, 511–512, 438 A.2d 1348, 1355 (1982). A local government official, acting either in his official or in his individual capacity, is a 'person' within the meaning of § 1983. *Kentucky v. Graham,* [473 U.S. 159, 165–167, 105 S.Ct. 3099, 3105–3106, 87 L.Ed.2d 114, 121–122 (1985) ]; *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 876, 83 L.Ed.2d 878, 883–884 (1985)."

Thus, the City of Frederick is a "person" under § 1983. Scalf and Ashton are also § 1983 "persons," both in their individual and official capacities.

There are important differences between individual capacity and official capacity suits under § 1983. We explained some of those differences in *Ritchie v. Donnelly, supra,* 324 Md. at 360–361, 597 A.2d at 440, as follows:

"In a § 1983 claim for damages against a government official in his or her individual capacity, the official, depending on his position, may assert absolute or qualified immunity. *Kentucky v. Graham,* [473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985)].... In a § 1983 suit against a governmental official in his or her official capacity, however, the above-mentioned immunity defenses are not available. *Kentucky v. Graham, supra,* 473 U.S. at 167, 105 S.Ct. at 3106, 87 L.Ed.2d at 122; *Owen v. City of Independence,* 445 U.S. 622, 638–639, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673, 685–686 (1980). Another difference between § 1983 individual capacity actions and official capacity actions is that punitive damages are available in the former but not in the latter. *Kentucky v. Graham, supra,* 473 U.S. at 167 n. 13, 105 S.Ct. at 3106 n. 13, 87 L.Ed.2d at 122 n. 13."

Additional characteristics of official capacity suits are pertinent to the present case. Suits against local government officials in their official capacities "represent only another way of pleading an action against an entity of which an officer is an agent...." *Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611, 635 n. 55 (1978). Consequently, "the real party in interest in an official-capacity suit is the governmental entity and not the named official...." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301, 309 (1991). *See also Ritchie v. Donnelly, supra,* 324 Md. at 358–359, 597 A.2d at 439. For this reason, the constitutional deprivation that underlies the § 1983 official capacity suit must be caused by a statute, regulation, policy or custom of the governmental entity. *See Hafer v. Melo, supra,* 502 U.S. at 25, 112 S.Ct. at

361–362, 116 L.Ed.2d at 309. Where, as here, the governmental entity is also a named defendant, the government ordinarily must pay the damages awarded in an official capacity suit. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985) ("a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself"); *Ritchie v. Donnelly, supra,* 324 Md. at 358–359, 597 A.2d at 439.

In *Hafer v. Melo, supra,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301, the Supreme Court held that a state official, who was not a § 1983 "person" in her official capacity, could nonetheless be sued under § 1983 in her individual capacity, on the basis of her official acts. The Court suggested that, in the context of a suit against a state official, "the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." 502 U.S. at 26, 112 S.Ct. at 362, 116 L.Ed.2d at 310.

With respect to a suit against a municipality or other local government entity, however, different considerations apply. Unlike the state, a unit of local government is a "person" within the meaning of § 1983, and can be held liable for the constitutional torts of its officials acting in their official capacities. Local government liability under § 1983 is based not upon principles of *respondeat superior,* but upon whether or not the acts of the employees sued in their official capacities are in fact the acts of the local government itself. As stated above, a local government official acts in an official capacity only to the extent that his actions implement governmental law, policy or custom. Consequently, the distinction between individual and official capacity suits against local government officers has a substantive dimension which may be lacking in suits against state officials. As this Court stated in *Ritchie v. Donnelly, supra,* 324 Md. at 361, 597 A.2d at 440, "a § 1983 action against a [local] government officer or employee does not become an official capacity action simply because of the labels used by the parties...."

 In the present case, the plaintiffs purported to sue Ashton and Scalf in both their individual and official capacities. With respect to the § 1983 claims based upon the unconstitutionality of the ordinance, the suits are clearly official capacity suits. As we stated in *Ritchie*, local government liability under § 1983 turns on "whether the federal law violation was caused by a governmental statute, policy or custom...." 324 Md. at 362, 597 A.2d at 440–441 (collecting authorities). The violation of the plaintiffs' due process rights in the present case was caused by the vagueness of the curfew ordinance. The plaintiffs' arrest represented the implementation of the City of Frederick's unconstitutional enactment.[21]

 The plaintiffs, however, included in their complaint § 1983 claims which do not turn on the unconstitutionality of the ordinance. The plaintiffs allege that the arrests at the Rainbow were "part of a pattern and practice and *de facto* policy of the Frederick City Police Department of violating the rights of African–American citizens and subjecting those citizens to disparate treatment." Thus, their § 1983 claims are based, in part, on asserted violations of the Equal Protection Clause of the Fourteenth Amendment. As previously indicated, the plaintiffs have alleged sufficient facts to generate a triable issue on their equal protection claims.

The plaintiffs' allegations of racial discrimination in the enforcement of the ordinance apparently involve only the liability of the City and Chief of Police Ashton. There is no suggestion in the record that Officer Scalf, who was charged with arresting any person around the Rainbow who appeared to be under eighteen, acted with any racially discriminatory

---

**21.** If the plaintiffs could bring individual capacity suits against the defendants on the basis of the unconstitutionality of the ordinance, the defendants would be able to assert the defense of qualified immunity. It was reasonable, in the sense required for § 1983 immunity, for the Police Chief of Frederick to institute a curfew enforcement action, and reasonable for Officer Scalf to perform the enforcement duties allocated to him. "[A] police officer is not charged with predicting the future course of constitutional law." *Pierson v. Ray, supra*, 386 U.S. at 557, 87 S.Ct. at 1219, 18 L.Ed.2d at 296.

intent. Rather, the plaintiffs contend that their detention reflected a policy of discrimination on the part of the City and the Police Department in enforcing the curfew ordinance. Thus, Police Chief Ashton was sued on this theory in his official capacity, as one of the high level municipal officers allegedly responsible for establishing a racially discriminatory policy for the City of Frederick.

Consequently, the suits against Ashton and Scalf in the present case are official capacity suits. Without distinguishing between the individual capacity and official capacity claims, or separately addressing the liability of the city, however, the trial court alternatively granted summary judgment on the § 1983 claims in favor of Ashton, Scalf and the City of Frederick, on the basis of qualified immunity. The Court of Special Appeals affirmed, also without differentiating among the separate defendants or between the individual and official capacity causes of action. The trial court and the Court of Special Appeals misconstrued the scope of the qualified immunity available under § 1983.

 Local government entities, including municipalities like the City of Frederick, are not entitled to immunity under § 1983, even if the local government official responsible for the alleged constitutional violation would be immune from an individual capacity suit. *Owen v. City of Independence, supra,* 445 U.S. at 657, 100 S.Ct. at 1418–1419, 63 L.Ed.2d at 697. The Supreme Court explained the principles underlying municipal liability in *Owen* as follows (445 U.S. at 651, 100 S.Ct. at 1415, 63 L.Ed.2d at 693):

> "A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed. Yet owing to the qualified immunity enjoyed by most government officials, see *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), many victims of municipal malfeasance would be left remediless if the city

were also allowed to assert a good faith defense. Unless countervailing considerations counsel otherwise, the injustice of such a result should not be tolerated."

Thus, the City of Frederick may not raise an immunity defense to the plaintiffs' § 1983 claims.

█ Likewise, because the official capacity suit is an action against the municipal office "rather than against the particular individual who occupied that office when the claim arose," *Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878, 885 (1985), Ashton and Scalf, sued in their official capacities, are not entitled to qualified immunity. *See Kentucky v. Graham, supra,* 473 U.S. at 167, 105 S.Ct. at 3106, 87 L.Ed.2d at 122; *Owen v. City of Independence, supra,* 445 U.S. at 657, 100 S.Ct. at 1419, 63 L.Ed.2d at 697; *Ritchie v. Donnelly, supra,* 324 Md. at 361, 597 A.2d at 440. "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity." *Kentucky v. Graham, supra,* 473 U.S. at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 121.

In the present case, since the municipality was sued directly and remains a party, and since the suits against Ashton and Scalf are official capacity suits, Ashton and Scalf will incur no liability under the § 1983 counts. The plaintiffs must look to the city for the payment of any damages awarded under the § 1983 counts. Thus, although summary judgment was improperly granted on the grounds relied on by the trial court, it may nevertheless be available to Scalf and Ashton on remand.

## VI.

Finally, we address the plaintiffs' nonconstitutional common law tort claims asserting intentional infliction of emotional distress, assault and battery, false imprisonment, invasion of privacy and negligence.

## A.

█ Except for the count charging intentional infliction of emotional distress, the circuit court's grant of summary judgment for the individual defendants on the nonconstitutional

tort counts appeared to be based on public official immunity. The Court of Special Appeals affirmed on the same ground.[22] Both courts below, however, erroneously broadened the scope of public official immunity.[23]

 The requirements for public official immunity were set forth by Judge J. Dudley Digges for the Court in *James v. Prince George's County*, 288 Md. 315, 323–324, 418 A.2d 1173, 1178–1179 (1980), as follows:

"Before a governmental representative in this State is relieved of liability for his negligent acts, it must be deter-

---

**22.** With respect to the count charging intentional infliction of emotional distress, the trial judge seems to have granted summary judgment for the defendants on the basis that the plaintiffs had failed to allege facts which, if true, would establish the tort. The Court of Special Appeals affirmed the trial court's disposition of the intentional infliction count on the ground that "nothing alleged by [Bowens and Brown] arises to the 'extreme and outrageous conduct' necessary to allege that tort." *Brown v. Ashton*, 93 Md.App. 25, 54 n. 11, 611 A.2d 599, 614 n. 11 (1992). We agree with both courts that the plaintiffs failed to allege facts which would give rise to a cause of action for intentional infliction of emotional distress.

**23.** Neither at trial, nor in the Court of Special Appeals, nor in this Court, have the parties raised the question whether Ashton and Scalf are entitled to the statutory immunity granted to municipal officers by Maryland Code (1974, 1995 Repl.Vol.), § 5–321 of the Courts & Judicial Proceedings Article. Consequently, we shall not rule on the applicability of the statute to the present case. Nevertheless, we note that the meaning of the statute is not entirely clear. Section (b)(1) of the statute confers immunity as follows:

"An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."

While the phrase "from any civil liability" is susceptible to broad interpretation, materials in the bill file from the Department of Legislative Reference suggest that the purpose of the statute was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries. The statute, first enacted in 1979 as Art. 23A, § 1B, of the Maryland Code, was precipitated by concern that some cases of the time threatened the concept of public official immunity for local government officials. The intent of the General Assembly in enacting the statute was apparently to protect common law public official immunity in the face of a perceived threat that it would be eliminated by judicial decision.

mined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties.... Once it is established that the individual is a public officer *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability."

In the present case, the plaintiffs' nonconstitutional tort claims are not limited to negligence, but include several so-called intentional torts. Public official immunity is not a defense to these intentional torts.

In *Mason v. Wrightson, supra,* 205 Md. 481, 109 A.2d 128, a police officer performed a warrantless search of the plaintiff, over the plaintiff's objection. This Court held the search to be "both an assault (and battery) and false imprisonment." 205 Md. at 487, 109 A.2d at 130. The Court refused to hold the police officer immune from suit on the basis of the search, reasoning (205 Md. at 487, 109 A.2d at 131) that

"[w]hen a peace officer goes beyond the scope of the law he may become liable civilly and is not shielded by the immunity of the law.... The fact that the [policeman] was acting under orders of a superior officer does not relieve him of civil liability for his actions which are illegal and beyond the scope of duty...."

In several other cases, public officials have contended unsuccessfully that they were entitled to qualified public official immunity from intentional tort suits. *See, e.g., Cox v. Prince George's County,* 296 Md. 162, 460 A.2d 1038 (1983) (false arrest, intentional infliction of emotional distress and false imprisonment); *Robinson v. Bd. of County Comm'rs,* 262 Md. 342, 278 A.2d 71 (1971) (assault, battery and malicious prosecution). *See also Brewer v. Mele,* 267 Md. 437, 298 A.2d 156 (1972) (false imprisonment and malicious prosecution).

Recently, in *Parker v. State*, 337 Md. 271, 285, 653 A.2d 436, 443 (1995), this Court contrasted absolute judicial immunity from civil suit with qualified public official immunity, observing that while judicial immunity applies to all tort actions, qualified public official immunity is a defense only to negligence actions. Moreover, this Court flatly held in *Cox v. Prince George's County*, *supra*, 296 Md. at 169, 460 A.2d at 1041, that "a police officer does not enjoy this immunity if he commits an intentional tort or acts with malice."

Consequently, while the defendants Ashton and Scalf are entitled to public official immunity with respect to the negligence counts, the summary judgments entered in favor of the individual defendants on several of the intentional tort counts must be vacated. For the guidance of the trial court and the parties on remand, we shall set forth the principles of Maryland law which are pertinent to these counts.

### B.

 The plaintiffs alleged that their arrest constituted the tort of invasion of privacy. Even if we assume, *arguendo*, that the plaintiffs' arrest violated interests which the privacy tort is intended to protect, the plaintiffs have failed to allege and submit facts establishing the tort under the circumstances of the present case. This Court has held that "reasonableness under the facts presented is the determining factor" in invasion of privacy suits of this type. *Beane v. McMullen*, 265 Md. 585, 600–601, 291 A.2d 37, 45 (1972). Although we have held that the plaintiffs were detained on an unconstitutional basis, the police officers who detained them did not act unreasonably, in the sense required by the tort of invasion of privacy, in light of the facts known to them. *See generally Household Fin. Corp. v. Bridge*, 252 Md. 531, 535–538, 250 A.2d 878, 881–884 (1969); *Carr v. Watkins*, 227 Md. 578, 586–588, 177 A.2d 841, 845–846 (1962).

### C.

In addition, the plaintiffs asserted causes of action for false

imprisonment, assault and battery.[24] Overlooking the rule that a grant of summary judgment should be sustained only upon the grounds relied on by the trial court, the Court of Special Appeals, as an additional basis for its holding with respect to the intentional tort claims, stated that an arrest made with probable cause and in good faith could not constitute an intentional tort. In connection with the plaintiffs' false imprisonment claim, the intermediate appellate court, citing *Brewer v. Mele, supra,* 267 Md. 437, 298 A.2d 156, stated that "[t]he fact that there was probable cause [for the plaintiffs' arrest], of course, eliminates one of the critical elements of the tort of false imprisonment. . . ." *Brown v. Ashton, supra,* 93 Md.App. at 52, 611 A.2d at 612. In this, the Court of Special Appeals erred.

The basic principles of Maryland law with respect to the tort of false imprisonment are well-established. Judge Digges, writing for the Court in *Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 654, 261 A.2d 731, 738 (1970), explained that "[t]he necessary elements of a case for false imprisonment are a deprivation of the liberty of another without his consent and without legal justification." *See also, e.g., Fine v. Kolodny,* 263 Md. 647, 651, 284 A.2d 409, 411 (1971) ("In any action for false imprisonment it is necessary for the plaintiff to prove by a preponderance of evidence that he was deprived of his liberty by another without his consent and without legal justification"), *cert. denied,* 406 U.S. 928, 92 S.Ct. 1803, 32 L.Ed.2d 129 (1972); *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173, 122 A.2d 457, 460 (1956); *Dorsey v. Winters,* 143 Md. 399, 410–411, 122 A. 257, 261 (1923); *Fleisher v. Ensminger,* 140 Md. 604, 620, 118 A. 153, 159 (1922); *Lewin v. Uzuber,* 65

---

**24.** The plaintiffs' causes of action for assault and battery are, under the circumstances of the case, analytically dependent upon the cause of action for false imprisonment. If the plaintiffs' arrests constituted a false imprisonment, then the physical force used in effectuating the arrests would give rise to a cause of action for assault and battery. Conversely, if the arrests themselves were not tortious, neither was the physical force used to effectuate them. The plaintiffs have not asserted a cause of action based on alleged excessive force in making lawful arrests.

Md. 341, 348–349, 4 A. 285, 289 (1886); *Mitchell v. Lemon,* 34 Md. 176, 180 (1871).

Furthermore, Judge Digges in *Great Atl. & Pac. Tea Co. v. Paul, supra,* 256 Md. at 655, 261 A.2d at 738, went on to explain the concept of "legal justification" within the meaning of the false imprisonment tort:

> "When the cases speak of legal justification we read this as equivalent to legal authority. . . . Whatever technical distinction there may be between an 'arrest' and a 'detention' the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest."

Thus, while the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false imprisonment action based on that arrest.

An arrest made under a warrant which appears on its face to be legal is legally justified in Maryland, even if, unbeknownst to the arresting police officer, the warrant is in fact improper. *Brewer v. Mele, supra,* 267 Md. at 440, 298 A.2d at 159; *Lewin v. Uzuber, supra,* 65 Md. at 348, 4 A. at 289; *Campbell v. Webb,* 11 Md. 471, 482 (1857). Moreover, a police officer has legal justification to make a warrantless arrest where he has probable cause to believe that a felony has been committed, and that the arrestee perpetrated the offense. *See* Maryland Code (1957, 1992 Repl.Vol., 1994 Cum. Supp.),. Art. 27, § 594B(c); *Nilson v. State,* 272 Md. 179, 321 A.2d 301 (1974); *Edger v. Burke,* 96 Md. 715, 722, 54 A. 986, 988 (1903). Thus, with respect to both of these types of arrest, legal justification to arrest may depend, in part, upon the arresting officer's good faith and reasonable belief in his authority to arrest.

█ With respect to warrantless arrests made by police officers for offenses other than felonies, and warrantless arrests made by private persons, different considerations apply. This Court has regularly held that a warrantless arrest by a police officer is legally justified only to the extent that a misdemeanor was actually committed in a police officer's view or presence. A private individual may make a warrantless arrest only when a felony has in fact been committed or "a misdemeanor is being committed in the presence or view of the arrester which amounts to a breach of the peace." *Great Atl. & Pac. Tea Co. v. Paul, supra,* 256 Md. at 655, 261 A.2d at 739.

█ The Court has consistently held that probable cause is not a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense, or upon an arrest by a private person.[25] *See, e.g., Great Atl. & Pac. Tea Co. v. Paul, supra,* 256 Md. at 654, 261 A.2d at 738 ("probable cause is not a defense to an action for false imprisonment but legal justification is"); *Clark's Brooklyn Park v. Hranicka,* 246 Md. 178, 186, 227 A.2d 726, 730 (1967) ("probable cause to suspect the plaintiffs and thus detain them ... could be considered in mitigation of damages, but not as a defense to the charge of false imprisonment"); *Safeway Stores, Inc. v. Barrack, supra,* 210 Md. at 173–174, 122 A.2d at 460 ("[i]n the ... action for false imprisonment, there must be a deprivation of the liberty of another without his consent and without legal justification. Although intent is necessary, 'malice' is not, nor is probable cause a defense");

---

**25.** The common law's reliance on lawful justification, rather than on the arresting individual's good faith and reasonable belief in his authority to arrest, is appropriate in this intentional tort, which was historically a form of trespass *vi et armis. See* Poe, 1 *Pleading and Practice in Courts of Common Law* § 228 at 179 (Tiffany, 5th ed. 1925). As with other intentional torts, the plaintiff seeking to establish false imprisonment need not prove that the defendant intended to act wrongfully; "the essence of the tort consists in depriving the plaintiff of his liberty without lawful justification, and the good or evil intention of the defendant does not excuse or create the tort." *Mahan v. Adam,* 144 Md. 355, 365, 124 A. 901, 905 (1924).

*Mahan v. Adam*, 144 Md. 355, 365, 124 A. 901, 905 (1924); *Dorsey v. Winters, supra*, 143 Md. at 410, 122 A. at 261; *Fleisher v. Ensminger, supra*, 140 Md. at 620, 118 A. at 159 (an unlawful detention "is false imprisonment, without regard to whether it is done with or without probable cause"). Thus, in *Mitchell v. Lemon, supra*, 34 Md. at 180–182, Judge Alvey, writing for this Court and upholding the validity of a warrantless arrest, emphasized *inter alia* the legal validity of the health ordinances and regulations which the arrestee had violated.

In 1969 the General Assembly enacted Ch. 561 of the Acts of 1969, which is now codified, as amended, at Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.), Art. 27, § 594B. The Title to the 1969 Act stated that the purpose of the legislation was to codify the common law of warrantless arrest, and in addition, "as to certain offenses, to extend, the authority of a police officer to make an arrest without a warrant...." The common law right of a police officer to arrest without a warrant for misdemeanors actually committed in his presence was extended in Art. 27, § 594B(b): "A police officer who has probable cause to believe that a ... misdemeanor is being committed in the officer's presence or within the officer's view, may arrest without a warrant any person whom the officer may reasonably believe to have committed such offense." In light of the legislative extension of the authority to make warrantless arrests, it appears in the present case that if a police officer inside the Rainbow had probable cause to believe that the curfew ordinance was being violated, and that the operator of the Rainbow was aware of the curfew violation, the police officer could have arrested the operator with lawful justification, even though the curfew ordinance was in fact invalid.

Nevertheless, the statutory authority of a police officer to make warrantless arrests for misdemeanors is not controlling in the present case. As previously discussed, § 15–14 of the Frederick City Code states, with respect to the liability of parents and the operators of establishments, that

the offenses set forth "shall constitute a misdemeanor, which shall be punishable by a fine not to exceed one hundred dollars ($100.00)." § 15–14(b) and (c). By contrast, a minor found violating the ordinance is not stated to be guilty of a misdemeanor. Rather, the curfew ordinance provides, in the first instance, that the minor should be taken into police custody as a child in need of supervision. § 15–14(a). Consequently, since the ordinance does not create a misdemeanor criminal offense with respect to minors who violate the curfew, the extension of authority by the 1969 statute does not seem to broaden the authority of the police officers to detain the plaintiffs in the present case. As a result, the disposition of the plaintiffs' false imprisonment count would appear to be governed by traditional Maryland common law principles. The objective lawfulness of the arrest, rather than the good faith or reasonable belief of the arresting officer, determines liability for the tort. *See Great Atl. & Pac. Tea Co. v. Paul, supra,* 256 Md. at 654, 261 A.2d at 738; *Clark's Park v. Hranicka, supra,* 246 Md. at 186, 227 A.2d at 730; *Safeway Stores, Inc. v. Barrack, supra,* 210 Md. at 173–174, 122 A.2d at 460; *Mahan v. Adam, supra,* 144 Md. at 365, 124 A. at 905; *Dorsey v. Winters, supra,* 143 Md. at 410, 122 A. at 261; *Fleisher v. Ensminger, supra,* 140 Md. at 620, 118 A. at 159. We have held that the plaintiffs' arrest was unlawful because it violated their rights under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. Consequently, the plaintiffs have, as an analytical matter, set forth a cause of action for false imprisonment against the individual defendants.

Nevertheless, as explained in Part V.B. of this opinion, the present case implicates the requirements of the Local Government Tort Claims Act relating to the allocation of financial responsibility for wrongdoing between local government officials and the governmental entity which employs them. Under the circumstances, where the local government officials acted without malice in the scope of performing their official duties, the Local Government Tort Claims Act requires that the burden of compensating the plaintiffs for their injuries

should be borne by the City of Frederick, rather than by the individual arresting officers. *See* n. 19, *supra.* As is the situation regarding the constitutional tort claims, any judgments for damages awarded against the individual defendants on the basis of the nonconstitutional tort claims should be paid by the City of Frederick.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THOSE PARTS OF THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY RELATING TO THE COUNTS CHARGING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND NEGLIGENCE, AND OTHERWISE TO VACATE THE JUDGMENT OF THE CIRCUIT COURT AND REMAND THE CASE TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE CITY OF FREDERICK.*

CHASANOW, J., concurs in the result only.

McAULIFFE, Judge, concurring in part and dissenting in part.

I agree that the Frederick City ordinance in question is void for vagueness. I disagree, however, with certain holdings of the Court concerning the claims for damages.

### I. *Claims Pursuant to 42 U.S.C. § 1983*

#### A.

The majority concludes that Ashton and Scalf "may" be entitled to summary judgment with respect to claims made against them under 42 U.S.C. § 1983. This is not a sufficiently strong statement. Both officers *are* entitled to summary judgment on these claims by simply asserting the proper grounds on remand. To the extent that claims are made against them in their official capacities, these are nothing

more than claims against the City, and because the City is a party these claims are duplicitous. To the extent the officers are sued in their individual capacities, as I believe they are, they are entitled under Federal law to qualified immunity. As the majority concedes at 113, *supra*, n. 21, the officers had no reason to believe the ordinance was unconstitutional, and the officers acted reasonably in enforcing the ordinance.

### B.

The majority suggests that in addition to a claim against the City for lack of due process resulting in unlawful detention, the plaintiffs have stated a claim for damages based on an alleged denial of the equal protection of laws because of racial discrimination in the enforcement of the ordinance. I do not agree that it is necessary or proper to recognize a tort action for damages for selective or discriminatory enforcement of laws.

It is well established that discriminatory prosecution can violate federal and state guarantees of equal protection. *See, e.g., Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *In re: Laurence T.,* 285 Md. 621, 403 A.2d 1256 (1979); *Purohit v. State,* 99 Md.App. 566, 638 A.2d 1206 (1994). Although the "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," the selection process cannot be deliberately "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 457, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).

That is not to say, however, that the appropriate remedy for discriminatory prosecution is to allow an action for damages. The traditional remedy for constitutionally impermissible selective prosecution has been dismissal of the criminal prosecution, and that, I suggest, is an adequate remedy. What must be borne in mind is that this remedy of dismissal is available to persons who are clearly guilty of the offense with which they are charged. Although not "fair" because the guilty go

free, the relief is appropriate to redress the constitutional wrong, and to deter discriminatory prosecution. To further redress the wrong by allowing those guilty of a crime to receive money from the arresting officers is an expansion of remedies neither necessary nor appropriate.

If, as here, persons are detained when they should not have been because the underlying statute is unconstitutional, there will be a remedy. That the arrest may also have been the result of discriminatory prosecution adds nothing to the damages suffered in this case, but the recognition of a cause of action for damages for discriminatory enforcement invites a plethora of actions and a battle of statistics.

## II. *Maryland Constitutional Tort Claims*

### A.

For the reasons given in Part I B, *supra,* I would not recognize a state constitutional tort claim for damages based upon discriminatory prosecution.

### B.

The majority holds that the police officers are not entitled to the defense of qualified immunity in connection with the constitutionally based claims for compensatory damages arising out of the officers' enforcement of an ordinance later declared unconstitutional. I disagree. As noted above, and as conceded by the majority, police officers are entitled to the defense of qualified immunity under these circumstances when a claim of deprivation of constitutional rights is made pursuant to 42 U.S.C. § 1983. In *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967) the Supreme Court said:

> We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983.... We agree that a police officer is not charged with predicting the future course of constitutional law.

Unless a reasonably well-trained police officer would have known that the Frederick City ordinance was unconstitutional, that officer should be entitled to qualified immunity when damages are claimed against him for actions taken by him in accordance with the ordinance. *See Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (good faith of officer is important in qualified immunity determination— absence of probable cause for arrest will not support claim for damages unless, on objective basis, it is obvious that no reasonably competent officer would have concluded a warrant should issue).

In *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982), the Supreme Court noted that "[f]or executive officers in general, . . . qualified immunity represents the norm."

The Court also observed in *Harlow* that it is "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Id.* at 818, n. 30, 102 S.Ct. at 2738, n. 30 (quoting *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909–2910, 57 L.Ed.2d 895 (1978)). There is no mention of immunity, qualified or otherwise, in 42 U.S.C. § 1983. The Supreme Court properly adopted the concept of immunity from the common law and applied it, with some selectivity, to the causes of action permitted by § 1983. *Pierson v. Ray, supra,* 386 U.S. at 557, 87 S.Ct. at 1219. When it recognized the availability of tort actions against federal officials for violation of certain provisions of the federal constitution, the Court was consistent in applying principles of immunity to those actions. *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738. This Court should do no less in recognizing the availability of the defense of qualified immunity to municipal officers.

The majority acknowledges that this Court has not previously been called upon to decide this question as it applies to local government officials. The majority points out, however, that we have said we will not recognize a qualified privilege in

favor of state officials in constitutionally based claims for damages for other than negligent conduct, and determines that we should do the same in the case of local government officials. Again, I disagree. This Court made it very plain in *Clea v. City of Baltimore*, 312 Md. 662, 685, 541 A.2d 1303 (1988), that a principal reason for denying a state official qualified immunity was that the State could not be sued because of sovereign immunity, and unless the officer could be held liable the law would "leave an individual remediless when his constitutional rights are violated." That reasoning is not applicable to municipal officers, because the municipality is not afforded sovereign immunity. The necessity for withholding qualified immunity that the Court perceived in the case of state officials simply does not exist here.

Finally, I would read § 5–321(b)(1) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 1995 Rep.Vol.), referred to in the Court's opinion at 116, n. 23, *supra*, as providing a clear indication of legislative intent to clothe municipal officials with common law immunity.

## III. Nonconstitutional Tort Claims

I agree with the majority that judgment in favor of the officers was properly entered with respect to the claims of invasion of privacy, intentional infliction of emotional distress, and negligence. I further agree that the remaining claims of assault and battery and of false imprisonment are related, and that if the arrests were not tortious, neither was the physical force used to effectuate them. See note 24 of the majority opinion, *supra*, at 119. I do not agree that these counts should remain viable.

The majority concedes that an element of a cause of action for false imprisonment is the absence of legal justification, and that "legal justification to arrest may depend, in part, upon the arresting officer's good faith and reasonable belief in his authority to arrest." Majority opinion at 120. The majority further recognizes that the legislature has broadened the authority of a police officer to arrest without a warrant so that

"[a] police officer who has probable cause to believe that a . . . misdemeanor is being committed in the officer's presence or within the officer's view, may arrest without a warrant any person whom the officer may reasonably believe to have committed such offense." Article 27, § 594B(b), Maryland Code (1957, 1992 Rep.Vol, 1994 cum. supp.) Based on this legislative grant of authority, the majority concluded that the officers lawfully could have made an arrest of an operator of the establishment because there was probable cause to believe that a misdemeanor was being committed and reason to believe that the operator had committed it. The majority refuses to extend this reasoning to the detention of the plaintiffs, however, stating that as to them the ordinance did not create a misdemeanor, and that the detention of the plaintiffs was not an arrest. As I understand it, the majority holds that the legislature intended to extend the power of a police officer only when a true misdemeanor was involved, and not in the case of a police officer detaining a juvenile on reasonable suspicion of conduct that would constitute a misdemeanor if committed by an adult. I do not agree that the legislature intended this distinction. Section 3–814(a) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 1995 Repl.Vol.) provides in pertinent part as follows:

(a) A child may be taken into custody by any of the following methods:

(1) . . . .

(2) By a law enforcement officer pursuant to the law of arrest;

(3) By a law enforcement officer or other person authorized by the court if he has reasonable grounds to believe that the child is in immediate danger form his surroundings and that his removal is necessary for his protection; . . . .

Given the reasonable belief of the officer that the City ordinance was valid and that the plaintiffs were in violation of the ordinance, this section of the code, particularly when read with Article 27, § 594B(b), provided legal justification for the detention. Accordingly, I agree with the determination of the

Court of Special Appeals that quite apart from any question of immunity, the officers are entitled to summary judgment in their favor on the remaining common law counts because there was "legal justification" for the arrests. *Brown v. Ashton,* 93 Md.App. 25, 53, 611 A.2d 599 (1992).